**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STEPHEN G. WHETSTONE, | Civil Action No.: 1:23-CV-2409-ABJ |
| Plaintiff, | |
| v. | |
| HOWARD UNIVERSITY, THE RETIREMENT PLAN COMMITTEE OF THE HOWARD UNIVERSITY EMPLOYEES' RETIREMENT PLAN; and JOHN/JANE DOES 1–10, | **FIRST AMENDED COMPLAINT - CLASS ACTION** |
| Defendants. | |

Plaintiff Stephen G. Whetstone, by and through his undersigned attorneys, on behalf of himself and all others similarly situated, states and alleges matters pertaining to himself and his own acts, upon personal knowledge, and as to all other matters, upon information and belief, based upon the investigation undertaken by their counsel, as follows:

## I. INTRODUCTION

1. This case is about Defendants unlawfully shortchanging retirees of the Howard University Employees' Retirement Plan (the "**Plan**") by millions of dollars through their use of outdated mortality tables in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA"). By using improper mortality tables to calculate joint and survivor annuities and preretirement survivor annuities for Plan participants, Defendants have harmed the financial security of Howard University's retirees and their loved ones, to Defendants' financial gain.

2. Defendants also had a fiduciary duty to act loyally and "solely in the interest of the participants and beneficiaries[,]" the duty to act with "care, skill, prudence, and diligence." ERISA

1

§ 404(a)(1), 29 U.S.C. § 1104(a)(1).  Defendants disregarded that duty, electing to use unreasonable and outdated formulas for payment of pension benefits that substantially underpaid Plan Participants for their own financial gain.

3.      Plaintiff brings this class action against Defendants Howard University ("**HU**"), the Retirement Plan Committee of the Plan (the "**Committee**"), and the individual members of the Committee during the relevant time period (collectively with HU, the Plan, and the Committee "**Defendants**") for violations of ERISA's actuarial equivalence requirements.

4.      Plaintiff and the Class (as defined below) are vested Participants in the Plan, which deprives them of monies to which they are entitled. Specifically, Plaintiff and Class Members are retired employees (and their beneficiaries) who receive pension benefits in the form of a joint and survivor annuity and preretirement survivor annuities.

5.      Defendants use formulas that appear to be based on outdated actuarial assumptions to calculate these types of benefits. These formulas result in Plaintiff and Class Members receiving less than the "actuarial equivalent" of the single life annuities offered to participants, in violation of ERISA's actuarial equivalence requirements.

6.      HU sponsors the Plan, under which Participants earn pension benefits as a single life annuity ("**SLA**"). An SLA is a monthly benefit for the life of the Participant. However, Participants can elect to receive their pension benefits in forms other than an SLA, such as a certain and life annuity or a joint and survivor annuity ("**JSA**").

7.      For married participants, the default form of pension payment is a JSA, which provides retirees with a monthly annuity for their lives and, when they die, a contingent annuity for the life of their spouse or beneficiary. *See* 29 U.S.C. § 1055(a). Plans label JSAs as a percentage of the benefit paid during the beneficiary's life. A 50% JSA pays the spouse half the amount the

retiree received each month; a 75% JSA pays the spouse three-quarters of what the retiree received each month; a 100% JSA pays the beneficiary the same amount the retiree received. Unless they choose otherwise and obtain their spouses' consent, Participants who are married when their benefits commence automatically receive a 50% JSA.

8.     To convert the SLA to the JSA, the Plan uses a formula based on actuarial assumptions — consisting of an interest rate and mortality table — to determine the amount by which it reduces a Participant's SLA to arrive at the monthly JSA benefit amount. A JSA recipient's monthly amount will generally be less than the amount he or she would receive as an SLA because pension plans must account for paying benefits for two lives (the retiree and his or her beneficiary) rather than one. This case concerns how Defendants unlawfully reduce the SLA offered to participants to arrive at the monthly JSA amount.

9.     ERISA requires that JSA benefits that pay between 50% to 100% (also known as "**Qualified Joint and Survivor Annuities**" or "**QJSAs**") be at least the "actuarial equivalent" of the retiree's SLA. *See* 29 U.S.C. § 1055(d); *see also* § 1055(e) (discussing the qualified preretirement survivor annuity and how benefits must not be less than the amount that would be payable as a survivor annuity under a QJSA).

10.     Two benefit forms are actuarially equivalent when the present values of the two benefits are the same, based on reasonable actuarial assumptions. Calculating present value requires interest rates and mortality tables. Interest rates discount the value of expected future payments to the date of the calculation. Because of the time value of money, a dollar today is worth more than a dollar in the future because that dollar can be invested today and earn interest. As a result, to calculate the value of a benefit stream, one must use a rate to discount the future payments to today's dollars. Mortality tables predict the rate at which retirees will die at any given age and,

therefore, the chance they will receive an additional year of benefits. The interest rate and mortality table work together to generate a "conversion factor" that is applied to the SLA offered to participants. Once applied, the conversion factor reduces the SLA to arrive at an alternate benefit form. The actuarial assumptions used in the formula directly impact the conversion factor.

11.     For the last several decades, mortality rates have improved. Generally, retirees today live longer than retirees from the 1960s and 1970s. Accordingly, mortality tables based on data from the 1960s and 1970s predict that people will die earlier than contemporary mortality tables. All else being equal, using an antiquated mortality table to calculate a conversion factor decreases the present value of an optional benefit form and, in turn, the monthly amount retirees receive. For example, a plan using a mortality table from the 1970s to calculate a 50% JSA — interest rates being equal — may produce a conversion factor of 0.90. In this scenario, a participant entitled to a monthly SLA benefit of $1,000 would receive $900 per month as a 50% JSA (his or her spouse would receive $450 per month). By contrast, a plan using a mortality table from 2023 — interest rates being equal — may produce a conversion factor of 0.93. The same retiree would receive $930 per month as a 50% JSA (his or her spouse would receive $465 per month).

12.     When plans make actuarial conversions from one benefit form to another or from normal retirement age to early or late retirement, ERISA's actuarial equivalence requirements apply. These statutory requirements, along with the associated Treasury regulations, ensure that, all else being equal, the forms of pension benefit that a retiree receives, and the time they receive those benefits relative to their normal retirement age, are *at least* as valuable as the SLA they are offered when their benefits begin. *See* ERISA §§ 205(d) and (e) and 204(c)(3), 29 U.S.C. §§ 1055(d) and (e) and 1054(c)(3); 26 C.F.R. § 1.401(a)-20, Q&A 16. ERISA's actuarial equivalence

requirements are designed to ensure that married participants receiving JSAs and early retirees are not penalized for their choices, regardless of the optional form they select or when they retire.

13.    ERISA § 204(c)(3) requires that an employee's accrued benefit, if it "is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . shall be the actuarial equivalent of such benefit[.]" 29 U.S.C. § 1054(c)(3). Failing to provide a participant with at least the actuarial equivalence of his or her vested benefit results in an illegal forfeiture in violation of ERISA § 203(a), 29 U.S.C. § 1053(a).

14.    Defendants violate ERISA's actuarial equivalence requirements by using outdated actuarial assumptions to determine optional forms of benefit, which unreasonably depress the value of JSAs and preretirement survivor annuities offered to Participants. Despite the considerable increases in life expectancy over the past 50 years, Defendants continue to use antiquated actuarial assumptions that do not reflect the conditions when Participants began receiving benefits. Defendants use formulas for determining optional forms of benefit that appear to be based on the Uninsured Pensioners 1984 mortality table ("**UP-84**"), based on data from the 1960s and 1970s. Coupled with a 7% interest rate, the UP-84 produces optional form conversion factors that are consistently lower than the conversion factors produced by contemporary actuarial assumptions causing Participants of the Plan who receive JSAs and preretirement survivor annuities to collect less than they would if Defendants used current and reasonable actuarial assumptions.

15.    Defendants' use of antiquated actuarial assumptions for determining optional benefit forms violates ERISA's actuarial equivalence requirements. It causes Participants (and their Beneficiaries) to receive less than they would if Defendants determined optional forms of benefit using the reasonable assumptions required by ERISA and the accompanying Treasury regulations.

5

16.    The damage caused by Defendants' unlawful use of formulas based on unreasonable actuarial assumptions has negatively affected and will continue to negatively affect Plaintiff and Class Members for the rest of their lives (and the lives of their spouses too).

17.    Plaintiff brings this action on behalf of a Class of Participants receiving JSAs between 50% and 100% and preretirement survivor annuities, pursuant to ERISA § 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) and (a)(3). Plaintiff seeks all appropriate equitable relief, including but not limited to a declaration that the Plan's formulas for determining JSAs and preretirement survivor annuities violate ERISA's actuarial equivalence and non-forfeitability requirements; an injunction requiring the Plan's fiduciaries to ensure that the Plan pays actuarially equivalent benefits to all Class members; an Order from the Court requiring Defendants to pay all amounts improperly withheld in the past and that they will withhold in the future; an Order requiring Defendants to recalculate Plaintiff and the Class's JSA and preretirement survivor annuities in accordance with ERISA's actuarial equivalence requirements; an Order requiring Defendants to increase the amounts of Plaintiff's and the Class's future benefit payments, and any other relief the Court determines to be just and equitable.

## II.    JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States and pursuant to 29 U.S.C. § 1332(e)(1), which provides for Federal jurisdiction of actions brought under Title I of ERISA.

19.    This Court has personal jurisdiction over HU because it is located in, transacts business in, employs people in, and has significant contacts with this District, and because ERISA provides nationwide service of process.

20.    This Court has personal jurisdiction over the Plan because it offers and pays pension benefits to Participants and Beneficiaries in this District and because ERISA provides for nationwide service of process.

21.    This Court has personal jurisdiction over the Committee because it offers and pays pension benefits to Participants and Beneficiaries in this District and because ERISA provides for nationwide service of process.

22.    This Court has personal jurisdiction over the individual members of the Committee because, upon information and belief, each transacts business in, resides in, and has significant contacts with this District and because ERISA provides nationwide service of process.

23.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Defendants may be found in this District, Defendants employed Plaintiff Whetstone and other Class members in this District, and otherwise does business in this District.

### III.    **PARTIES**

24.    Plaintiff Stephen G. Whetstone resides in Laurel, Maryland, and is a Participant in the Plan. He worked for HU for approximately 14 years. His benefits, which Defendants calculated using the Plan's unlawful formulas, began on September 1, 2018. He elected the 66 2/3% JSA offered by the Plan as a "Qualified" JSA with his wife as the beneficiary.

25.    HU is a private, federally chartered research university in Washington, D.C., that offers undergraduate, graduate, and professional degrees. HU is the "plan sponsor" for the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B). HU is also the Plan's "administrator" within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A). Pursuant to 29 U.S.C. § 1102, Defendants established the Plan and maintained it pursuant to a written instrument known as a "Plan Document."

26.    Upon information and belief, the Committee is an unincorporated association based in Washington, DC. The Committee is a named fiduciary under the Plan. The President of HU appoints the Committee members.

27.    John/Jane Does 1 through 10, inclusive, are the individual members of the Committee responsible for administering the Plan throughout the relevant time period. Their names and identities are not currently known. Upon information and belief, each transacts business in, resides in, and has significant contacts with this District.

### IV.    BACKGROUND

#### A.    *Actuarial Equivalence Under ERISA*

28.    Actuarial equivalence is a "term of art" (*Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011)), which "Congress intended [] to have its established meaning." *McDermott Int'l, Inc. v. Wilander*, 498 US 337, 342 (1991). If "Congress has used technical words or terms of art, it is proper to explain them by reference to the art or science to which they are appropriate." *Corning Glass Works v. Brennan*, 417 US 188, 201 (1974) (citations omitted). "And so, it makes sense that when the 'appropriate methodology' for calculating an actuarially-equivalent value 'is not apparent from the face of the definition of actuarial equivalence, nor from the statute or regulations as in effect,' courts look 'to practice within the field of actuarial science.'" *Adams v. US Bancorp*, No. 22-cv-509, 2022 US Dist. LEXIS 188713, at *16 (D. Minn. Oct. 17, 2022) citing *Pizza Pro Equip. Leasing v. Comm'r*, 147 TC 394, 412 (2016), *aff'd*, 719 F. App'x 540 (8th Cir. 2018).

29.    At the heart of actuarial equivalence calculations is the concept of "***present value***." Actuarial equivalence describes two benefit streams as having equal present values. As the Court of Appeals for the DC Circuit explained: "Two modes of payment are actuarially equivalent when their ***present values*** are ***equal*** under a given set of assumptions." *Stephens*, 644 F.3d at 440

8

(emphasis added) (citing Jeff L. Schwartzmann & Ralph Garfield, Education and Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1-24-91 (1991) ("Schwartzmann & Garfield"). Relying on the Society of Actuary's definition of actuarially equivalent benefits, the *Stephens* court instructed that "within the actuarial field, 'actuarial equivalen[ce]' is understood to require a present-value calculation." *Adams*, No. 22-cv-509, 2022 US Dist. LEXIS 188713, at *16 citing *Stephens*, 644 F.3d at 440.

30.    Present value is the value of a payment stream on a specific measurement date adjusted for the time value of money. The Society of Actuaries[1] defines the "Present Value" of a cash flow as the "value of a future cash flow given by a present value model under a particular set of assumptions about ***future economic or other conditions*** . . . ."[2] Simply put, present value is the value of an amount of money today in terms of its worth in the future.

31.    Like the Society of Actuaries, ERISA defines "present value" as "the value adjusted to reflect ***anticipated events***." ERISA § 3(27), 29 U.S.C. § 1002(27). Such adjustments, the definition continues, "shall conform to such regulations as the Secretary of the Treasury may prescribe." *Id.*

32.    Calculating present value requires two primary ingredients: (1) an interest rate and (2) a mortality table. An interest rate discounts future dollars to the present. The rate is often called a "discount rate," which is the rate of return one could earn on an investment. *See Berger v. Xerox Corp. Retirement Income Guar. Plan*, 338 F.3d 755, 759 (7th Cir. 2003). ("A discount rate is simply

---

[1] The Society of Actuaries ("SOA") is a global professional organization for actuaries founded in 1949 that provides the exams, certifications, and continuing education necessary to practice as an actuary in the US.

[2]    (Emphasis added), *see* Society of Actuaries, Glossary. Available at: https://www.soa.org/4a537f/globalassets/assets/files/edu/actuarial-glossary.pdf (last accessed May 22, 2023).

an interest rate used to shrink a future value to its present equivalent."). A mortality table shows the rate of deaths occurring during a selected time interval and predicts the likelihood of death for an individual within the current year.[3] Using discount rates and mortality tables, an actuary can determine whether two benefit forms (e.g., an SLA and JSA) are actuarially equivalent by comparing the present values.

33.     ERISA's actuarial equivalence requirements help ensure that pension plan participants receive at least the same value of monthly benefit regardless of the benefit form. The notion is that a participant should not be penalized for selecting one form of pension benefit over another.

34.     Under ERISA, defined benefit plans must offer at least two payment options: one for married participants (i.e., JSAs) and one for unmarried participants (i.e., SLAs). However, a JSA could pay out for longer because plans make payments to the participant and, potentially, the beneficiary. Therefore, if the monthly payment to the participant remains the same, a JSA will be more expensive than an SLA because the beneficiary may also receive payments.

35.     To account for the additional value from a JSA, plan sponsors reduce the participant's SLA or the monthly amount he or she will receive. Plans use formulas based on actuarial assumptions to determine the amount of the reduction to the SLA. The actuarial assumptions generate a conversion factor that is applied to the SLA to determine the reduction in benefits to arrive at the JSA amount. To ensure plans do not shortchange participants and their beneficiaries on their JSA benefits, Congress required that JSAs be at least "actuarial[ly] equivalent" to the SLAs offered to non-married participants. *See* 29 U.S.C. § 1055(d); *see also* 26 U.S.C. § 417 (same requirement under the Tax Code). Accordingly, actuarial equivalence should

---

[3] *See* Society of Actuaries, definition of "Mortality" *supra* note 2.

be cost-neutral, whereby the "cost" to the plan should be the same regardless of the benefit the participant selects.

36.     ERISA's actuarial equivalence requirements impose duties on pension plans in form and timing. *See Esden v. Bank of Bos.*, 229 F.3d 154, 163 (2d Cir. 2000) ("What these provisions [ERISA's actuarial equivalence provisions] mean in less technical language is that: (1) the accrued benefit under a defined benefit plan must be valued in terms of the annuity that it will yield at normal retirement age; and (2) if the benefit is paid at *any other time* (e.g., on termination rather than retirement) or in ***any other form*** (e.g., a lump sum distribution, instead of annuity) it must be worth at least as much as that annuity.") (Emphasis added.).

37.     With regards to the ***form*** of pension benefit, ERISA requires that qualified JSAs ("**QJSAs**") be at least the actuarial equivalent of the value of the SLA offered to the retiree at the times benefits commence. 29 U.S.C. § 1055(d)(1). The Tax Code repeats this definition at 26 USC § 417(b)(2) (defining QJSA as "the actuarial equivalent of a single annuity for the life of the participant") and § 417(g)(2) (defining QJSA as "the actuarial equivalent of a single annuity for the life of the participant").[4] A plan can offer multiple qualified JSAs ranging from 50% to 100%. 29 U.S.C. § 1055(d)(1). ERISA defines a "qualified" JSA as "any annuity in a form having the effect of an annuity described in" ERISA § 205(d)(1). Accordingly, plans can offer multiple "qualified" JSAs that provide the spouse with not less than 50% and not greater than 100% of the benefit the participant was receiving. *See* 29 U.S.C. § 1055(d)(1); *see also* 26 C.F.R. § 1.401(a)-20 Q & A 20 (discussing how multiple forms of benefit that satisfy the requirements of § 1055 can

---

[4] The Internal Revenue Code (the "Tax Code") has parallel provisions for ERISA's actuarial equivalence requirements, and the Treasury regulations provide further guidance into the rules. *See* 26 U.S.C. §§ 417(b)(2), 411(c)(3); *see also* 26 C.F.R. § 1.411(c)-1(e) (referring to the "actuarial equivalence" of the participant's accrued benefit in conformance with Treasury regulations).

be "qualified" JSAs). The QJSA for unmarried individuals is the SLA. *See* 26 C.F.R. § 1.401(a)-20 Q & A 25 ("A QJSA for a participant who is not married is an annuity for the life of the participant").

38.     A plan must designate one of the qualified JSAs as the default option for married participants, which can be more valuable than the other qualified JSAs offered (26 C.F.R. § 1.401(a)-20, Q&A 16) but cannot be less than the actuarial equivalent of the SLA offered to the participant when he or she commences benefits (29 U.S.C. § 1055(d)(1)). If the plan offers optional forms of benefit that are more valuable than the SLA, then the default QJSA must be of at least equal value to that benefit form. *See* 26 C.F.R. § 1.401(a)-20, Q&A 16. That way, married and unmarried participants have at least one form of benefit available to them that is equivalent to the most valuable benefit form.

39.     Under ERISA, plans must also offer a qualified preretirement survivor annuity ("**QPSA**"). *See* ERISA § 205(a)(2), 29 U.S.C. § 1055(a)(2). A QPSA is an annuity paid to the participant's surviving spouse if the participant dies before his or her benefits commence. *See* ERISA § 205(e), 29 U.S.C. § 1055(e). A QPSA must be at least the actuarial equivalent of the amount the spouse would have received if the participant had selected the plan's default QJSA and died. ERISA § 205(e)(1)(A), 29 U.S.C. § 1055(e)(1)(A).

40.     With regards to the ***time*** a retiree opts to start receiving benefits, ERISA requires that "if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . the employee's accrued benefit . . . shall be the actuarial equivalent of such benefit[.]" § 204(c)(3), 29 U.S.C. § 1054(c)(3). ERISA defines "normal retirement age" as age 65, or younger if provided by the pension plan. ERISA § 3(24), 29 U.S.C. § 1002(24); *see also* 26 U.S.C. § 411(a)(8); Treas. Reg. § 1.411(a)–7(b). In other words, if a

participant chooses to begin receiving benefits prior to or after the "normal retirement age," the benefit must be at least the actuarial equivalent of the amount the retiree would have received as an SLA at the normal retirement age.

41.     Calculating a JSA benefits for a participant who retires early or late involves two steps: a *vertical conversion* and a *horizontal conversion*. While the two processes can, and often do, work in tandem, ERISA sets independent limitations for each conversion process.

42.     A *vertical conversion* occurs when the participant's normal retirement benefit at normal retirement age is converted to an actuarially equivalent SLA at the participant's benefit commencement date ("BCD") by adjusting the benefit to offset the participant's expected number of payments. ERISA imposes no ceiling on vertical conversions, but it does impose a floor. In other words, plans can subsidize early and late benefits, but must ensure early and late retirement benefits be at least as valuable as the participant's age-65 SLA.[5]

43.     A *horizontal conversion* occurs when the participant's SLA at BCD is converted into an optional form of benefit (i.e., a JSA). Again, ERISA permits certain benefit forms to be more valuable than others, but qualified JSAs, QOSAs, and QPSAs must have a present value that is at least equal to the SLA at BCD. Unlike vertical conversions, which use the participant's age-65 SLA as the comparator, horizontal conversions use the participant's SLA at BCD as the comparator.[6]

---

[5] *See* 26 C.F.R. § 1.411(d)-3 (defining a subsidy as "the excess, if any, of the actuarial present value of a retirement-type benefit over the actuarial present value of the accrued benefit commencing at normal retirement age or at actual commencement date, if later, with both such actuarial present values determined as of the date the retirement-type benefit commences. . . ."); *see, e.g., Esden v. Bank of Bos.*, 229 F.3d 154, 163 (2d Cir. 2000); *West v. AK Steel Corp.*, 484 F.3d 395, 406 (6th Cir. 2007).

[6] 26 C.F.R. § 1.401(a)-20, Q&A-16 (a plan's "QJSA must be at least as valuable as any other optional form of benefit payable under the plan *at the same time*") (Emphasis added.); *see* 26 C.F.R. § 1.401(a)-11(b)(2) ("A qualified joint and survivor annuity must be at least the actuarial

44.    Plans are not required to use the same formulas or methodologies for vertical and horizontal conversions. Indeed, many plans use different formulas for determining JSAs compared to the formulas plans must use to determine lump sum benefits. Likewise, some plans use formulas that subsidize early retirement benefits but do not subsidize late retirement benefits to encourage older employees to retire. While ERISA has separate actuarial equivalence requirements for vertical (§ 204), and horizontal (§ 205), the formulas used for both vertical and horizontal conversions must produce benefits that satisfy ERISA's actuarial equivalence requirements. Both vertical and horizontal conversions can give rise to ERISA claims, however, in this case, Plaintiff challenges only the horizontal conversion.

## B.    Actuarial Equivalence Requires Reasonable Assumptions

45.    Reasonable assumptions must underlie the actuarial computation of present value to achieve equivalence.[7] As discussed above, ERISA defines "present value" as "the value adjusted to reflect **anticipated events**. Such adjustments, the definition continues, "shall conform to such regulations as the Secretary of the Treasury may prescribe." *Id.* (emphasis added.)

46.    The Treasury regulations repeatedly reference using reasonable assumptions when performing actuarial equivalence calculations. For example, the Treasury regulation concerning QJSAs provides that "[e]quivalence may be determined, on the basis of consistently applied **reasonable actuarial factors**, for each participant or for all participants or reasonable groupings

---

equivalent of the normal form of life annuity or, if greater, of any optional form of life annuity **offered under the plan**") (Emphasis added.).

[7] "To be equivalent means to be 'equal in force, amount, or value.' [Definition of] *Equivalent*, Merriam-Webster, https://www.merriam-webster.com/dictionary/equivalent. Only accurate and **reasonable actuarial assumptions** can convert benefits from one form to another in a way that results in equal value between the two." *Urlaub v. CITGO Petro. Corp.*, Docket No. 21 C 4133, 2022 US Dist. LEXIS 30616, at *19–20 (ND Ill. Feb. 22, 2022).

of participants." 26 C.F.R. § 1.401(a)-11(b)(2) (emphasis added). Likewise, the Treasury regulation discussing protected accrued benefits defines "[a]ctuarial present value" as meaning "determined using ***reasonable actuarial assumptions***." 26 C.F.R. §1.411(d)-3(g)(1) (emphasis added). Further, when making actuarial reductions to determine the early retirement benefits of terminated vested participants — which 29 U.S.C § 1056(a)(3) governs — the corresponding Treasury regulations instruct plans to use "reasonable actuarial assumptions." 26 C.F.R. § 1.401(a)-14(c)(2). It "would be strange for the [Treasury] Commissioner to provide greater protection to participants who were terminated before reaching minimum early-retirement age rather than those who are active." *Adams*, 2022 US Dist. LEXIS 188713, at *21.

47.    There is also a reasonableness requirement for lump-sum distributions. Indeed, within the context of cash balance plans, the regulations require optional forms of benefit to be actuarially equivalent "using reasonable actuarial assumptions." 26 C.F.R. § 1.411(a)(13)-1(b)(3). When comparing optional forms of benefits to a QJSA, plans must use either the "applicable" mortality table and interest rates, which are "considered reasonable actuarial assumptions," or specify their own "reasonable interest rate and reasonable mortality table." 26 C.F.R. §§ 1.417(a)(3)-1(c)(2)(iv)(A)–(B) and (f)(ii)(2)(i)(A)–(B). As the court in *Adams* stated: "***A reasonableness requirement is consistent with ERISA's structure and purpose***." *Adams*, No. 22-cv-509, 2022 US Dist. LEXIS 188713, at *21 (emphasis in original).

48.    The American Academy of Actuaries (the "**Academy**"), a professional organization that represents and unites actuaries in all practice areas, similarly requires using reasonable actuarial assumptions. In 1988, the Academy created the Actuarial Standards Board ("**ASB**"), which promulgates standards of practice for the entire profession in the United States. The ASB issues actuarial standards of practice ("**ASOPs**") that discuss how each demographic (i.e.,

mortality) and economic (i.e., interest rate) assumption that an actuary selects must be reasonable. *See* ASOP Nos. 35 and 27.

49.    The ASOPs, published by the ASB, dictate that "each economic assumption used by an actuary should be reasonable." *See* ASOP 27, para. 3.6. An assumption is "reasonable" if it "reflects the actuary's professional judgment," "takes into account historical and current economic data that is relevant as of the ***measurement date***," and "reflects the actuary's estimate of future experience." *Id.* (emphasis in original).

50.    ASOP 35, discussing Demographic and Other Noneconomic Assumptions, explains that an actuary "should select reasonable demographic assumptions in light of the particular characteristics of the defined benefit plan that is the subject of measurement."[8] Para. 3.3.5 — titled "Select a Reasonable Assumption" — echoes this idea and states that an assumption is reasonable if it "reflects the actuary's professional judgment," "takes into account historical and current demographic data that is relevant as of the ***measurement date***," and "reflects the actuary's estimate of future experience." *Id.* (emphasis in original).

51.    Courts have also signaled that plans should use reasonable actuarial assumptions to calculate pension benefits. *See Smith v. Rockwell Automation, Inc.*, 438 F. Supp. 3d 912, 921 (ED Wis. 2020) ("plans must use the kind of actuarial assumptions that a reasonable actuary would use at the time of the benefit determination"); *Masten v. Metropolitan Life Ins. Co. Empl. Bens. Committee*, 543 F. Supp. 3d 25, 33 (SDNY 2021) ("the Court finds it plausible that the Plan's use of decades-old mortality tables is not a 'reasonable' actuarial assumption in light of the ready availability of updated alternatives . . . the Court concludes that ***ERISA requires that Plan***

---

[8] See ASOP 35, Section 3 Analysis of Issues and Recommended Practices. Available at: https://www.actuarialstandardsboard.org/asops/selection-of-demographic-and-other-noneconomic-assumptions-for-measuring-pension-obligations/ (last accessed May 22, 2023).

***administrators use reasonable actuarial assumptions when converting SLAs into alternative benefits***" (emphasis added); *Urlaub,* 2022 US Dist. LEXIS 30616, at \*19 ("it cannot possibly be the case that ERISA's actuarial equivalence requirements allow the use of unreasonable mortality assumptions"); *Skrtich v. Pinnacle West Capital Corp.*, 2023 U.S. Dist. LEXIS 136862, at \*8 (D. Ariz. Aug. 7, 2023) ("the statute [§ 1055] requires actuarial ***equivalence*** and the calculation of that equivalence necessitates the use of reasonable assumptions"); *Dooley v. Am. Airlines, Inc.*, No. 81-C-6770, 1993 US Dist. LEXIS 15667, 1993 WL 460849, at \*11 (ND Ill. Nov. 4, 1993) ("The term 'actuarially equivalent' means ***equal in value*** to the present value of normal retirement benefits, determined on the basis of actuarial assumptions with respect to mortality and interest which are ***reasonable*** . . . .") (emphasis added).

52.     The assumptions pension plans use to determine actuarial equivalence are not reasonable simply by being expressed in the plan document. *See Laurent v. Pricewaterhouse Coopers LLP*, 794 F.3d 272, 286 (2d Cir. 2015) ("ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit"); *Esden*, 229 F.3d at 164 ("If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of 'actuarial equivalence'").

## V.     FACTUAL ALLEGATIONS

### A.  *The Plan*

53.     HU established The Plan on July 1, 1976, to "provide retirement security for eligible employees." *See* HU Employees' Retirement Plan (hereinafter the "**Plan Document**").

54.     The Plan is an "employee pension benefit plan" within the meaning of ERISA §

3(2)(A), 29 U.S.C. § 1002(2)(A), and a "defined benefit plan" within the meaning of ERISA §

3(35), 29 U.S.C. § 1002(35).

55.     All Participants in the Plan are current or former employees of HU.[9] Based on data

from the most recently filed public documents, the Plan has 4,182 Participants and Beneficiaries

receiving payments from the Plan; HU employs 1,019 active participants as of June 30, 2022.  *See*

Form 5500 for the Plan (2021). Employees hired before December 31, 2008 (with at least five

years of service) may participate in the Plan. Defendants froze the plan and benefit accruals as of

June 20, 2010.[10]

56.     Under the Plan, Participants accrue benefits in the form of an SLA. A Participant's

accrued benefit equals the sum of a fraction of the frozen benefit pay or the dynamic benefit. There

is a four-step process to determine the frozen benefit pay: (1) the Participant's base benefit is

calculated, which is 2% of the participant's final average compensation (based on the Participant's

compensation for the three highest consecutive calendar years during the ten years prior to the

measurement date) multiplied by their credited service projected to their normal retirement date

(not over 30 years); (2) the base benefit is reduced by 50% of the Participant's primary social

security benefit; (3) that amount is multiplied by a fraction equal to the Participant's credited

service on June 30, 1988, divided by their credited service at their normal retirement date (not

greater than one); (4) 1% of the Participant's compensation for each year of credited service earned

---

[9] There are several exceptions, including employees classified as House Staff at the HU Hospital, full-time students at HU, employees covered by the Civil Service Retirement System, or any leased employee.

[10] There was an exception for Participants who are members of the American Federation of State, County, and Municipal Employees Local No. 2094, who continued accruing benefits from July 1, 2010, through January 1, 2012.

after June 30, 1988, and before June 30, 2010 is added. The dynamic benefit equals 1% of the participant's compensation for each year of credited service earned after June 30, 1988. Using these formulas, the Plan determines a Participant's SLA, the default benefit form for unmarried Participants. The default form of benefit for married Participants is a 50% JSA.

57.     The Plan also offers Participants optional forms of benefit, including 66 2/3%, 75%, and 100% JSAs, life annuities with years certain (5, 10, 15, and 20 years), and a Social Security leveling income option. In addition, the Plan offers a Preretirement Survivor Benefit (i.e., a QPSA), which is 50% of the amount payable to a Participant if he had retired and selected a 50% JSA.

58.     The Plan's definition of "Actuarial Equivalent" in § 1.1 of the Plan does not explain how to calculate optional forms of benefit, except for lump sums.[11] For lump sums on or after July 1, 2008, available only to Participants with an accrued benefit equal to or less than $5,000, the Plan uses the applicable interest rate under Code § 417(e) in May from the preceding year and the applicable mortality table (i.e., the Treasury Assumptions). The definition of "Actuarial Equivalent" provides the actuarial assumptions used to calculate ***only*** lump sums. The Plan does not list the assumptions for determining JSAs or other optional forms of pension benefit. However, it appears the Plan converts a Participant's SLA to an optional benefit form like a JSA using the 1984 Unisex Pension Mortality Table and a 7% interest rate.[12]

---

[11] The Plan states, in relevant part: Effective July 1, 2008, Actuarial Equivalence for lump sum payments shall be determined based on the applicable mortality table specified in Code Section 417 (e)(3)(B) and applicable interest rate specified under Code Section 417(e)(3)(C) (with a stability period of one Plan Year and a lookback month which is the May preceding the first day of the Plan Year).

[12] In Part V of the Schedule SB Attachment to the Plan's Form 5500 (2021), it states under the Summary of Plan Provisions that "Actuarial Equivalence" is "[f]or all other purposes [except lump sums], the UP-84 Mortality Table for [sic] and a 7% interest rate." While this formula is absent from the Plan Document, the Plan appears to calculate JSA benefits using these assumptions.

59.     The Normal Retirement Age under the Plan is 65, but the Plan allows Participants to retire early if the sum of their age and the number of full credited service is equal to or higher than 70.[13] To account for the longer period over which the Plan anticipates to pay the Participant, the Plan reduces an early retiree's benefit by roughly half a percent for each month up to 60 months before the Participant's normal retirement date and by roughly three percent for each of the next 60 months.[14]

60.     Similarly, the Plan offers subsidized late retirement by providing participants with the "greater of" two options: (1) the monthly retirement benefit calculated in the same way as if the employee had retired at his or her Normal Retirement Date plus the Dynamic Benefit determined as of the participant's BCD; or (2) an actuarially adjusted version of Option 1 using the Plan's definition of "Actuarial Equivalent."[15] Thus, when determining the vertical conversion of participants' benefits (i.e., the early or late actuarial adjustment), the Plan has several different formulas that can apply.

### B.    The Plan's Actuarial Assumptions Are Unreasonable

61.     As discussed, throughout the relevant period, the Plan used formulas that appear to be based on the following assumptions to determine the amount of Participants' optional forms of benefits: UP-84 and 7% interest rate.

62.     Neither the interest rate nor the mortality tables underlying the Plan's formulas for calculating JSAs reflect the economic conditions or the mortality rates of Participants during the

---

[13] *See* §§ 3.3 and 4.3 of the Plan.

[14] The Plan, § 4.3.

[15] *Id.*, § 4.2.

relevant time period when Defendants calculated Plaintiff's and the Class's benefits. Using antiquated interest rates and mortality tables is unreasonable and unlawful under ERISA.

### i.      Reasonable Discount Rates

63.    The Treasury is a reliable source for a "reasonable" discount rate for any given year. The Treasury regularly updates the discount rate, known as the "applicable interest rate." According to the Treasury, pension plans should use discount rates that reflect the actuary's "best estimate," anticipated future events, and economic data as of the measurement date. The "applicable interest rate" is based on corporate bond yields and is updated throughout the year.

64.    The applicable interest rate is a yield curve. Yield curves provide for different rates depending on when future payments are made. The applicable interest rate is based on the first, second, and third Segment Rates. *See* 26 U.S.C. §§ 417(e)(3)(C) and 430(h)(2)(C). The Segment Rates are determined using yields on corporate bonds with maturities of 0 to 5 years, 5 to 20 years, and beyond 20 years. The Segment Rates are appropriate benchmarks for pension plans because the maturity rates closely correspond to the time period over which a pension plan will pay its retirees. The following shows the IRS Segment Rates over the past six years:

| Year | 417(e) Segment Rates for May | Effective Rate |
|------|------------------------------|----------------|
| 2023 | 4.91% / 5.15% / 5.34% | 5.13% |
| 2022 | 3.23% / 4.59% / 4.69% | 4.17% |
| 2021 | 0.61% / 2.84% / 3.54% | 2.33% |
| 2020 | 1.08% / 2.78% / 3.47% | 2.44% |
| 2019 | 2.72% / 3.76% / 4.33% | 3.60% |
| 2018 | 3.08% / 4.19% / 4.58% | 3.95% |
| 2017 | 1.96% / 3.77% / 4.62% | 3.45% |

65.    Defined benefit plans use the "applicable interest rate" to calculate the present values of lump sum benefits. Section 417(e) of the Tax Code provides that a pension plan can offer a lump sum benefit. However, the present value of the lump sum must be at least equal to the present value calculated using the "applicable mortality table" and "applicable interest rate"

(collectively referred to as the "**Treasury Assumptions**"). *See* 26 U.S.C. § 417(e)(3). While a plan can subsidize a lump sum benefit, the applicable interest rate (coupled with the applicable mortality table) sets a "floor" for the present value below which a lump sum cannot go.

66.    Indeed, for providing the relative value of all benefit forms, including JSAs, the applicable interest rate is considered per se reasonable for actuarial equivalence purposes. *See* 26 C.F.R. § 1.417(a)(3)-1 (c)(2)(iv)(B).

### ii.    *Reasonable Mortality Tables*

67.    Mortality tables show the probability of death for a specific group of individuals or population groups. Pension Plans use mortality tables to estimate the probability of a participant dying before they receive another year of benefits. Mortality is a key assumption in determining benefits and liabilities that should represent the "best estimate" of the expected duration of future benefit payments.

68.    Mortality tables for pension plans should be updated regularly to reflect changes in life expectancy. Indeed, "plan management should consider the specific demographics of their plan when evaluating the appropriate mortality or other assumptions to use, as well as relevant available mortality data. . . . *[management] should consider any published new mortality data for their plans in relation to their plan-specific mortality experience and future expectations*."[16]

69.    Several organizations publish mortality tables used by pension plans, but the primary source is the SOA. The Retirement Plan Experience Committee ("RPEC") of the SOA publishes the mortality tables upon which many pension plans across the country rely. The SOA

---

[16] (Emphasis added) PWC, US Pensions Guide, Defined benefit plan financial statements, § 9.4.4, June 30, 2022. Available at: https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/pensions-and-employee-benefitspeb/peb_guide/Chapter-9-PEB/94_Defined_benefit_plan_financial_statements_8.html (last accessed June 8, 2023).

bases its mortality tables on "experience studies" that measure the actual mortality experience of pension plan participants in the United States.

70.     These "experience studies" were the basis for the mortality tables published by the SOA in 1971, 1976 (the "**UP-84**"), 1983 (the "**1983 GAM**"), 1994 (the "**1994 GAR**"), 2000 (the "**RP-2000**"), 2014 ("**RP-2014**") and 2019 (the "**Pri-2012**"). Periodically, the tables are updated to account for changes in the mortality experience of US workers over the years. The SOA typically publishes new mortality tables or sets of tables several years after the date they are named after. For example, the SOA released the RP-2000 mortality tables in 2000 based on the mortality experience of pension plan participants from 1990–1994.

71.     For the past 50 years, the SOA's experience studies show a steady upward trend in life expectancy. Generally, retirees in the last 15 years live longer than retirees in the 1970s and 1980s. A study that the SOA published in 2014 indicated that the RP-2000 mortality tables "no longer reflect the actual mortality experience of pension plan participants and projected trends in that experience."[17] When the SOA released the RP-2014 mortality tables, the managing director for the SOA predicted that the update would increase liabilities for pension plans between 4% and 8%.[18] The increase in liabilities spurred Moody's to conclude that plan sponsors would have to divert $110 billion to their pension plans over seven years to fund additional liabilities.[19] The chart

---

[17] Mortality Tables for Determining Present Value Under Defined Benefit Pension Plans, 26 C.F.R. 1, 82 FR 46388, 46397.

[18] *See* Society of Actuaries Pledges Faster Mortality Scale Updates, available at: https://www.plansponsor.com/society-of-actuaries-pledges-faster-mortality-scale-updates/ (last accessed May 31, 2023)

[19] *Id.*

below shows the increase in life expectancy over the last few decades and the corresponding impact on plan liabilities:



*See* Plaintiff's Expert Report, *Rockwell v. Berube*, No. 20-cv-01783, ECF No. 55-5 at 18.

72.    As the graph above demonstrates, a 70-year-old today is expected to live roughly 30% longer than a 70-year-old retiree in the 1980s. It is improper for a pension plan to use a 50-year-old mortality table to calculate a retiree's benefits in 2019 because antiquated mortality assumptions fail to account for the improvements in life expectancy over the past few decades. For example, the SOA released the UP-84 — comparable to the GAM 71 shown above — in 1976. Data collected from 1965–1970, now ***over 50 years old***, form the basis of the UP-84. In the last 50 years, there have been substantial improvements in lifestyle habits and healthcare, which lowered the mortality rates of pensioners. The UP-84 does not account for these improvements.

73.    Further, the UP-84 was compiled in an era when much of the workforce was male; only 20% of the mortality experience reflected in the UP-84 is based on female employee experience. Because the SOA released the UP-84 before the significant improvements in life expectancy and shifts in the US workforce in the last 50 years, it is no longer an appropriate table for calculating pension benefits for retirees from 2018 to the present. Nevertheless, pension plans, like the Plan, continue to use the UP-84 to calculate retirees' benefits today.

74.    A benchmark for reasonable mortality rates is the mortality assumption released by the Treasury. Like discount rates, the Treasury also releases the "applicable mortality table," based on the most up-to-date SOA mortality tables. When prescribing the applicable mortality tables, the Secretary must consider the "results of available independent studies of mortality of individuals covered by pension plans." *Id.* In other words, the IRS defers to the SOA when it comes to the mortality rates of pensioners.

75.    Plan sponsors must make minimum contributions to their pension plans, and the Treasury prescribes the tables that plans should use. For plan years beginning on or after January 1, 2023, the Treasury regulations prescribe the use of mortality tables based on the Pri-2012 Report,[20] which is based on RPEC's experience study for the period 2005–2014 and is the best available study of the actual mortality experience of participants.[21] The "applicable mortality table" must be updated (at least every ten years, but, in practice, the Treasury updates the rates more frequently) and "must be based on the actual experience of pension plans . . . ." 26 U.S.C. § 430(h)(3)(A).

---

[20] *See* IRS Notice 2022-22; *see also* 87 FR 25161, 25163.

[21] *See* 87 FR 25161, 25163.

76.     For measuring pension plan liabilities, plan sponsors can apply to use plan-specific mortality tables that more accurately reflect the experience of a given plan's participants. *See* 26 U.S.C. § 430(h)(3)(C). If a plan has enough participants and has been around long enough, it can apply to the IRS to use company-specific mortality tables based on the experience of the plan's participants to determine present values under § 430. Similarly, plans can use separate mortality tables for disabled participants because disabled participants generally have different mortality rates from healthy pensioners. *See* 26 U.S.C. § 430(h)(3)(D). Like the plan-specific tables, mortality tables used for disabled participants must be periodically updated. Through its regulatory guidance, the Treasury believes that it is important to regularly update mortality tables used by pension plans to ensure that they are accurate and reflect the latest mortality trends.

77.     As discussed, the Treasury Assumptions, including the applicable mortality table, are *per se* reasonable for determining the present values of different benefit forms. *See* 26 C.F.R. § 1.417(a)(3)-1 (c)(2)(iv)(B).

### C.     *The Plan's Formulas for Calculating Survivor Annuities and Preretirement Annuities Do Not Satisfy ERISA*

78.     As discussed, the Plan used formulas that appear to be based on the UP-84 and a 7% discount rate throughout the relevant period to convert the SLA offered to participants to JSAs and to convert the SLA that participants would have received into QPSA benefits for Participants and their beneficiaries.

79.     Using these assumptions to convert the SLA to an optional benefit form was and continues to be unreasonable because the discount rate does not reflect the economic conditions on the Participants' measurement dates (i.e., the dates Defendants determined their benefits). Similarly, the mortality table does not reflect the experience of the Participants or pensioners in general, let alone future "anticipated events" (i.e., the anticipated mortality rates of pensioners).

26

80.    The conversion factors produced by the Plan's formulas for determining JSAs and QPSAs are unreasonably low compared to the conversion factors produced using reasonable assumptions like the Treasury Assumptions. The following chart shows a comparison of the conversion factors for a 65-year-old participant and 65-year-old spouse using the Plan's assumptions and the conversion factors using the § 417(e) assumptions from 2019 when Plaintiff's benefits started:

| Year | Benefit Form | The Plan's Conversion Factors | Monthly Amount Using Conversion Factors Produced by Plan Formula | Conversion Factors Produced Using Treasury Assumptions | Monthly Amount Using the Treasury Conversion Factors | Percent Difference in Benefit Amount |
|------|-------------|-------------------------------|-----------------------------------------------------------------|--------------------------------------------------------|------------------------------------------------------|--------------------------------------|
| 2019 | SLA | N/A | $1,000.00 | N/A | $1,000.00 | N/A |
|      | 50% JSA | 0.9047 | $904.70 | 0.9268 | $926.80 | **2.44%** |
|      | 100% JSA | 0.8260 | $826 | 0.8636 | $863.60 | **4.55%** |

81.    The chart above demonstrates that Defendants' use of unreasonable and unlawful formulas to convert the SLA to a JSA results in a substantial difference in monthly income.

82.    Using the UP-84 and 7% to convert the SLA offered to participants to qualified JSAs and QPSA benefits violates ERISA's actuarial equivalence requirements. The JSA benefits produced using this formula are not at least actuarially equivalent to the SLA Participants were offered when their benefits started. Accordingly, Plaintiff and the Class receive less each month than they would have if the Plan had used reasonable assumptions to convert the SLAs they were offered, such as the Treasury Assumptions, which the Plan uses to calculate lump sum benefits.

83.     Plaintiff Whetstone began collecting benefits under the Plan on September 1, 2018. He accrued, and Defendants offered him an SLA that would have paid him $680.50 monthly. He selected a qualified 66 2/3% JSA, which pays $584.73 monthly. If Defendants used the May 2018 Treasury Assumptions to convert the SLA he was offered to a 66 2/3% JSA — as the Plan used to calculate lump sums for Participants retiring at the same time — instead of the Plan's formula, Plaintiff's benefit would be approximately $602.72 or $17.99 more per month. By converting the SLA Plaintiff was offered using a formula that appears to be based on antiquated actuarial assumptions that produce unreasonably low conversion factors instead of reasonable, current actuarial assumptions like the applicable Treasury Assumptions, Defendants reduced the present value of Plaintiff's benefits by approximately $2,882 (past damages of $1,043.42 and future damages of $1,838.58).

84.     Because the Plan uses outdated formulas, based on unreasonable actuarial assumptions like the UP-84 coupled with a 7% discount rate, to convert the SLA participants were offered to optional benefit forms, while using reasonable actuarial assumptions for determining lump sum benefits, it results in participants receiving JSAs that are less than the actuarial equivalent of the SLA they were offered. Thus, using these outdated formulas to determine optional benefit forms deprives participants of the full amount of benefits to which they are entitled whilst Defendants reap the benefits.

85.     Defendants' use of formulas based on antiquated assumptions that produce unreasonably low conversion factors for Participants throughout the relevant time period has caused the benefits paid to Participants and their beneficiaries who receive JSAs and QPSAs not to be actuarially equivalent, in violation of ERISA §§ 205(d) and 203(a), 29 U.S.C. §§ 1055(d)

and 1053(a). Instead of receiving the benefits to which they are entitled, Plaintiff and the Class

have been and continue to receive benefits that are lower than they should be.

## VI.    CLASS ACTION ALLEGATIONS

86.    Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil

Procedure on behalf of himself and the following Class (the "Class"):

> All Participants and Beneficiaries of the Plan who (1) began
> receiving benefits on or after six years prior to August 17, 2023, (2)
> are receiving a JSA with a survivor benefit of at least 50% and no
> more than 100% of the benefit paid during the retiree's life, or are
> receiving a QPSA, and (3) are receiving a benefit where the actuarial
> present value of their annuity as of the date benefits began was less
> than the actuarial present value of the SLA they were offered using
> the applicable Treasury Assumptions as of the date benefits began.
> Excluded from the Class are Defendants, and any individuals
> subsequently determined to be fiduciaries of the Plans.

87.    The members of the Class are so numerous that joinder of all members is

impractical. The Class includes hundreds of individuals. Based on government filings, as of June

30, 2021, 4,217 Participants and Beneficiaries were receiving benefits under the Plan.

88.    Plaintiff's claims are typical of the claims of the members of the Class because they

arise out of the same policies and practices as alleged herein, and all members of the Class are

similarly affected by Defendants' wrongful conduct. Plaintiff and all Class Members seek identical

remedies under identical legal theories, and Plaintiff's claims do not conflict with the interests of

any other members of the Class in that Plaintiff and the other members of the Class were subject

to the same conduct and suffered the same harm.

89.    There are questions of law and fact common to the Class, which predominate over

questions affecting only individual Class members. Common legal and factual questions include,

but are not limited to:

A. Whether the actuarial assumptions used to convert the SLA offered to participants at BCD to JSAs and QPSAs are unreasonable;

B. Whether the actuarial assumptions used to determine the value of Participants' JSAs and QPSAs violate the actuarial equivalence requirements of ERISA;

C. Which actuarial assumptions would produce a reasonable conversion factor to apply to Plaintiff and Class Members' SLA at BCD to satisfy ERISA's actuarial equivalence requirements;

D. Whether the actuarial assumptions used by the Plan to calculate Participants' optional forms of benefits caused harm to Plaintiff and Class Members;

E. Whether HU violated its fiduciary duties of loyalty and prudence under ERISA;

F. Whether HU should be enjoined from applying the Plan's formulas for converting SLAs to JSAs and QPSAs and instead be required to calculate optional forms of benefits for Plaintiff and Class Members based on reasonable actuarial assumptions; and

G. Whether Plaintiff and the Class should receive additional benefits.

90.     Plaintiff will fairly and adequately represent the Class because Plaintiff has no interests antagonistic to those of other members of the Class, and the adjudication of their claims will necessarily decide the identical issues for all other Class Members. Plaintiff is committed to the vigorous prosecution of this action.

91.     Plaintiff has retained counsel competent and experienced in ERISA and class action litigation.

92.     Plaintiff does not anticipate any difficulty in management of this matter as a class action.

93.     The requirements of Rule 23(b)(1)(A) are satisfied because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

94.     The requirements of Rule 23(b)(1)(B) are satisfied because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

95.     Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

96.     Individual Class Members do not have an interest in controlling the prosecution of these claims in individual actions rather than a class action because the equitable relief sought by any Class Member will either inure to the benefit of the Plan or affect each Class Member equally.

97.     If the Class is not certified under Rule 23(b)(1) or (b)(2), then certification under (b)(3) is appropriate because the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members. A class action is superior to other available methods for the fair and efficient adjudication of the controversy because the damages suffered by each individual Class Member is relatively modest compared to the expense and burden of individual litigation. It would be impracticable for each Class Member to seek redress individually for the wrongful conduct alleged herein. There will be no difficulty in the management of this litigation as a class action as the legal issues affect standardized conduct by Defendant and class actions are commonly used in such circumstances. Furthermore, since joinder of all members is impracticable, a class action will allow for an orderly and expeditious administration of the claims of the Class. It will foster economies of time, effort, and expense.

## VII.   CAUSES OF ACTION

### COUNT I: VIOLATION OF ERISA'S JSA
### ACTUARIAL EQUIVALENCE REQUIREMENT
### (ERISA § 205, 29 U.S.C. § 1055)

98.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

99.     The Plan improperly converts the SLA offered to participants at BCD to optional benefit forms, including qualified JSAs, below what they would receive if those optional benefits were determined using formulas that satisfied ERISA's actuarial equivalence requirements.

100.    ERISA § 205(d), 29 U.S.C. § 1055(d) requires plans to provide qualified JSAs that are "the actuarial equivalent of a single annuity for the life of the participant." Similarly, the applicable Treasury regulations state that plans must provide qualified JSAs that are "at least the actuarial equivalent of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan . . . determined, on the basis of consistently applied ***reasonable actuarial factors***[.]" 26 C.F.R. § 1.401(a)-11(b)(2) (emphasis added).

101.    Because the Plan uses formulas based on antiquated, unreasonable actuarial assumptions to calculate JSA benefits, those benefits are not actuarially equivalent to the SLA Defendants offered to Participants.

102.    Defendants' use of outdated formulas to convert the SLA to optional forms of benefit, based on unreasonable actuarial assumptions, as set forth herein, is a violation of ERISA § 205(d), 29 U.S.C. § 1055(d).

103.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

104.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff seeks all available and appropriate remedies to redress violations of ERISA's actuarial equivalence requirements outlined in § 1055(d), including but not limited to the relief set forth below in the Prayer for Relief.

### COUNT II: VIOLATION OF ERISA'S DEFINITELY DETERMINABLE RULES (ERISA § 402, 29 U.S.C. § 1102)

105.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

106.    The Plan does not provide the formula it uses to determine optional forms of benefit like JSAs and to make late retirement adjustments. Instead, the Plan's definition of "Actuarial Equivalence" discusses the formulas used for calculating *only* lump sum benefits. Without stating the formula used to calculate Plaintiff's benefits, there was no way for him or any other member of the Class to determine what the proper amount of benefits should have been. Because the Plan fails to provide a "definitely determinable" benefit, the Plan violates ERISA § 402, 29 U.S.C. § 1102.

107.    ERISA § 402(a)(1) states that every "employee benefit plan shall be established and maintained pursuant to a written instrument" and every "employee benefit plan shall . . . specify the basis on which payments are made to and from the plan." ERISA § 402(b)(4), 29 U.S.C. § 1102(b)(4). "The plan administrator is obliged to act 'in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [Title I] and [Title IV] of [ERISA],' § 1104(a)(1)(D), and ERISA provides no exemption from this duty when it comes time to pay benefits." *Kennedy v. Plan Administrator for DuPont Savings & Investment Plan*, 555 U.S. 285, 300 (2009).

108.    By failing to define "Actuarial Equivalence" to include the formulas used to determine optional forms of benefit, except for the lump sum, the Plan failed to specify the basis

on which payments are made from the Plan. Instead, Defendants paid JSA and QPSA benefits according to a formula that is not contained in the Plan. Because § 1.1 provides the only formula for determining optional forms of pension benefit, Plaintiff and the Class are entitled to the difference between the amount of benefits they received and are currently receiving and the amount of benefits they would have received if the Plan had converted their SLA at BCD to an optional benefit form using the formula in § 1.1.

109.    Defendants' failure to define "Actuarial Equivalence" to include the formulas sued to determine optional forms of benefit, and their related failure to specify the basis on which payments are made from the Plan violates ERISA § 402, 29 U.S.C. § 1102.

110.    ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides for a private cause of action by a "participant or beneficiary" "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

111.    Plaintiff seeks all available and appropriate remedies to redress violations of ERISA's definitely determinable rules, including but not limited to the relief set forth below in the Prayer for Relief.

## COUNT III: BREACHES OF FIDUCIARY DUTY
### (ERISA § 404, 29 U.S.C. § 1104)

112.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

113.    During all relevant times, HU was an acting fiduciary of the Plan and was responsible for paying benefits in accordance with ERISA's requirements and the Plan's terms, unless those Plan terms themselves violated ERISA.

114.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), imposes several fiduciary duties on Plan Administrators, including the duty to act loyally and "solely in the interest of the participants and beneficiaries[,]" the duty to act with "care, skill, prudence, and diligence" — which includes ensuring that benefits paid pursuant to a defined benefit plan conform with ERISA's statutory requirements — and the duty to act "in accordance with the documents and instruments governing the plan *insofar as such documents and instruments are consistent with* the provisions of" subchapters I and III of ERISA. 29 U.S.C. § 1104(a)(1) (emphasis added).

115.    Here, the Committee and its members are fiduciaries for the Plan because they exercised discretionary authority or discretionary control respecting the management of the Plan as well as authority and control over the disposition of the Plan's assets. *See* ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). They had authority or control over the amount and payment of JSAs and QPSAs paid from Plan assets.

116.    The Committee breached these fiduciary duties by administering a Plan that did not conform with ERISA's actuarial equivalence requirements. The Committee failed to fulfill their duty to regularly and adequately review the terms of the Plan, or cause the terms of the Plan to be reviewed, to ensure those terms complied with ERISA's actuarial equivalence requirements. The Committee acted disloyally by causing Plaintiff and the Class to receive benefits that were not actuarially equivalent to their SLAs at BCD, thereby enabling HU, as Plan Sponsor, to retain additional money by reducing the minimum amount it was required to contribute to the Plan.

117.    The Committee's breaches, as set forth herein, caused Plaintiff and participants to receive fewer benefits each month than they would have received if the Plan's formulas complied with ERISA's actuarial equivalence requirements.

118.    ERISA requires fiduciaries who appoint other fiduciaries to monitor their actions to ensure they comply with ERISA. HU, therefore, had a fiduciary duty to monitor the actions of the Committee to ensure they complied with ERISA.

119.    HU breached its fiduciary duties to supervise and monitor the Committee by allowing them to administer a Plan that had not been adequately reviewed and, therefore, to pay benefits that were not actuarially equivalent to the SLA offered to participants at their BCDs, which is a violation of ERISA.

120.    Here, HU was a fiduciary for the Plan because it was a named fiduciary under the Plan and exercised discretionary authority or discretionary control respecting the management of the Plan as well as authority and control over the disposition of the Plan's assets. *See* ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). HU had authority or control over the amount and payment of JSAs and QPSAs from Plan assets.

121.    HU also failed to act prudently and diligently by failing to sufficiently review the terms of the Plan, including the formulas used to calculate JSA and QPSA benefits, which caused Plaintiff and the Class to receive less than the full value of their ERISA-protected accrued benefit. HU's breaches caused Participants to forfeit a portion of the accrued benefit.

122.    As a direct and proximate result of these fiduciary breaches, Class members lost millions of dollars in vested pension benefits.

123.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

124.    Plaintiff seeks all available and appropriate remedies to redress violations of ERISA's fiduciary duties outlined in § 404(a)(1), 29 U.S.C. § 1104(a)(1), including but not limited to the relief set forth below in the Prayer for Relief.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment against Defendants on all claims and requests that the Court awards the following relief:

A.    An Order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as Class representative, and appointing the undersigned to act as Class Counsel;

B.    A declaratory judgment that the formulas used by the Plan for converting participants' SLAs at BCD to JSA and QPSA benefits violate ERISA's actuarial equivalence requirements outlined in ERISA § 205(d), 29 U.S.C. § 1055(d);

C.    A declaratory judgment that the Plan's definition of "Actuarial Equivalence" does not satisfy the definitely determinable requirement in violation of ERISA § 402, 29 U.S.C. § 1102;

D.    A declaratory judgment that the Committee breached its fiduciary duties in violation of ERISA § 404, 29 U.S.C. § 1104 for, *inter alia*, failing to regularly and adequately review the terms of the Plan and for administering and following Plan terms that violated ERISA and for failing to pay benefits to Participants in conformance with ERISA's actuarial equivalence requirements outlined in ERISA § 205(d), 29 U.S.C. § 1055(d);

E.    A declaratory judgment that HU breached its fiduciary duties in violation of ERISA § 404, 29 U.S.C. § 1104 for, *inter alia*, failing to regularly and adequately

review the terms of the Plan and for administering and following Plan terms that violated ERISA and for failing to pay benefits to Participants in conformance with ERISA's actuarial equivalence requirements outlined in ERISA § 205(d) and, 29 U.S.C. § 1055(d);

F.     An Order requiring Defendants to provide an accounting of all prior payments of benefits to the Class under the Plan for which Defendants used the outdated and unreasonable assumptions discussed herein to convert participants' SLAs at BCD to JSAs and QPSAs, and provide information to recalculate those payments to Class members in compliance with ERISA § 205(d), 29 U.S.C. § 1055(d);

G.     Declaratory and injunctive relief as necessary and appropriate, including enjoining Defendants from further violating the duties, responsibilities, and obligations imposed on them by ERISA with respect to the Plan and ordering Defendants to pay future benefits to JSA and QPSA recipients in accordance with ERISA § 205(d), 29 U.S.C. § 1055(d);

H.     Disgorgement of any benefits or profits Defendants received or enjoyed due to the violations of ERISA § 205(d), 29 U.S.C. § 1055(d);

I.     Restitution of all amounts Defendants kept in the Plan but were obliged to pay to Plaintiff and other Class Members in accordance with ERISA § 205(d), 29 U.S.C. § 1055(d);

J.     Surcharge from Defendants totaling the amounts owed to participants or the amount of unjust enrichment obtained by Defendants as a result of the violations of ERISA § 205(d), 29 U.S.C. § 1055(d);

K.      Relief to the Plan from the Committee and HU for their violations of ERISA § 404, 29 U.S.C. § 1104, including a declaration that the Plan's formulas for converting participants' SLAs at BCD to JSAs and QPSAs violate ERISA § 205(d), 29 U.S.C. § 1055(d); restoration of losses to the Plan and its Participants caused by the Committee and HU's fiduciary violations; disgorgement of any benefits and profits HU received or enjoyed from the use of the Plan's assets or violations of ERISA; surcharge; payment to the Plan of the amounts owed to Class Members caused by fiduciary breach so that those amounts owed can be provided to Plan participants; and all appropriate injunctive relief, such as an order requiring HU to pay all Participants fully ERISA-compliant benefits in the future and to ensure that all benefits it pays to Participants conform to the requirements outlined in ERISA § 205(d), 29 U.S.C. § 1055(d);

L.      An award of pre-judgment interest on any amounts awarded to Plaintiff and the Class to law;

M.      An award of Plaintiff's attorneys' fees, expenses, and taxable costs, as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), or other applicable doctrine; and

N.      Any other relief the Court determines is just and proper.

**SIRI & GLIMSTAD LLP**

/s/ *Lisa R. Considine*
Lisa R. Considine (*pro hac vice*)
Oren Faircloth (*pro hac vice* to be filed)

745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: lconsidine@sirillp.com
E: ofaircloth@sirillp.com

*Attorneys for Plaintiff*