**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STEPHEN G. WHETSTONE, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>HOWARD UNIVERSITY, *et al.*,<br><br>*Defendants*. | Civil Action No. 23 - 2409 (LLA) |

**MEMORANDUM OPINION AND ORDER**

After three years of litigation, the parties in this proposed class action arising under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, have reached a settlement agreement. The agreement provides that Defendants Howard University and the Retirement Plan Committee of the Howard University Employees' Retirement Plan will pay $1.3 million to resolve the claims of proposed class members for alleged underpayment of pension benefits. *See* ECF No. 49-3. Plaintiff Stephen G. Whetstone has filed an unopposed motion seeking (1) leave to file a second amended complaint, (2) preliminary class certification, (3) preliminary approval of the settlement, and (4) approval of the form and method of class notice. ECF No. 49. For the reasons explained below, the court grants the motion.

## I. FACTUAL BACKGROUND

The court recounts the relevant factual allegations in Mr. Whetstone's first amended complaint, ECF No. 15, as described in its previous memorandum opinion, ECF No. 25.

Howard University established its Employees' Retirement Plan (the "Plan") in July 1976. ECF No. 15 ¶ 53. It qualifies as an "employee pension benefit plan" and a "defined benefit plan" under ERISA. *Id.* ¶ 54 (citing 29 U.S.C. § 1002(2)(A), (35)). Howard University "froze the plan and benefit accruals" in June 2010. *Id.* ¶ 55.

The Plan defines the "normal retirement age" as sixty-five but permits both early and delayed retirement when certain conditions are met. *Id.* ¶¶ 59-60; ECF No. 19-3, at 16. Early retirement is proper if the participant's age plus years of service exceeds seventy. ECF No. 19-3, at 16. Should a participant choose early retirement, they are penalized with a roughly 0.6% monthly reduction for the first five years of benefit payouts and a roughly 0.3% reduction for the following five years. *Id.* at 19-20. Delayed retiree participants are eligible for the higher of (1) "the normal retirement benefit plus the Dynamic Benefit as of the participant's benefit commencement date, or (2) an actuarially adjusted version of Option 1 using the Plan's definition of 'Actuarial Equivalent.'" ECF No. 20, at 8; *see* ECF No. 19-3, at 19. The delayed retirement option is "essentially the opposite of an actuarial reduction for early retirement." ECF No. 19, at 6. The Plan's definition of "actuarial equivalence" is written in the context of calculating lump-sum distributions, but it specifies use of the 1984 Unisex Pension Mortality Table ("UP-84") and a 7% interest rate. ECF No. 19-3, at 2-3. Conversions between "normal retirement age" and either early or delayed retirement are known as "vertical conversions." ECF No. 15 ¶¶ 41-44.

The default form of retirement benefit is a single life annuity ("SLA"), which consists of a monthly benefit paid out for the duration of the plan participant's life. *Id.* ¶¶ 6, 56. Married participants typically receive a joint and survivor annuity ("JSA"), which "provides retirees with a monthly annuity for their lives, and, when they die, a contingent annuity for the life of their spouse or beneficiary." *Id.* ¶¶ 6-7 (citing 29 U.S.C. § 1055(a)). There are several JSA options,

and each varies in the amount of benefits a spouse may receive upon a participant's death. For example, "[a] 50% JSA pays the spouse half the amount the retiree received each month[,] a 75% JSA pays the spouse three-quarters of what the retiree received each month," and so on. *Id.* ¶ 7.

The SLA is calculated using a four-step formula. *Id.* ¶ 56. Once the SLA is determined, the Plan uses a formula to convert the SLA into an alternative form, like a JSA. *Id.* ¶¶ 57-60. Under ERISA Section 205(d), qualified JSAs must be the "actuarial equivalent" of the SLA. 29 U.S.C. § 1055(d). All of the Plan's JSA options are qualified under ERISA. ECF No. 15 ¶ 57; 29 U.S.C. § 1055(d)(1)(A). The Plan uses the UP-84 Mortality Table and a 7% interest rate when converting an SLA into a JSA. ECF No. 15 ¶ 58; ECF No. 19-4, at 101.[1] Conversions between an SLA and other forms of benefits, like JSAs, are known as "horizontal conversions." ECF No. 15 ¶ 43.

Mr. Whetstone participated in the Plan. *Id.* ¶ 24. He worked at Howard University for approximately fourteen years and began receiving his benefits on September 1, 2018. *Id.* Mr. Whetstone retired when he was seventy, so his benefits were calculated using the delayed retirement formulas. ECF No. 19-2, at 9. His SLA was $680.50 per month. ECF No. 15 ¶ 83. Mr. Whetstone instead chose a 66 2/3% JSA, which pays him $584.73 per month. *Id.* Mr. Whetstone believes that if the Plan had used "reasonable actuarial assumptions"—in the form of the Treasury Department's preferred numbers—to make this horizontal conversion, his monthly payout would be $602.72, amounting to $17.99 more per month. *Id.* He claims that the Plan is using "antiquated actuarial assumptions"—the UP-84 Mortality Table and a 7% interest rate—to

[1] When citing to ECF Nos. 19-2, 19-4, the court refers to ECF-generated page numbers rather than any internal pagination.

convert SLAs into JSAs, resulting in JSAs that are not the "actuarial equivalent" of the SLA under ERISA Section 205(d). *Id.*

## II. PROCEDURAL HISTORY

In August 2023, Mr. Whetstone brought this action on behalf of himself and similarly situated Plan participants. ECF No. 1. In November 2023, he filed an amended complaint against Howard University, the Retirement Plan Committee of the Howard University Employees' Retirement Plan, and various John Does. ECF No. 15. His amended complaint raised three counts under ERISA: violation of the JSA actuarial equivalence requirement under ERISA Section 205(d), 29 U.S.C. § 1055(d) (Count I); violation of the definitely determinable rules requirement under ERISA Section 402(b)(4), 29 U.S.C. § 1102(b)(4) (Count II); and breach of fiduciary duty under ERISA Section 404(a)(1), 29 U.S.C. § 1104(a)(1) (Count III). ECF No. 15 ¶¶ 86, 98-124. Defendants filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and (6). ECF No. 19. In September 2024, the court granted the motion in part and denied it in part. ECF No. 25. Specifically, the court dismissed Count II as time-barred but concluded that Mr. Whetstone had adequately stated a claim with respect to Counts I and III. *Id.* at 10-20.

Defendants subsequently filed an answer, ECF No. 27, and the parties commenced discovery, *see* ECF No. 31. In November 2024, the court referred the case to Magistrate Judge G. Michael Harvey for mediation. Nov. 21, 2024 Minute Order. Mr. Whetstone filed a motion for leave to file a second amended complaint to expand the time period for the putative class, *see* ECF Nos. 33, 34, and the court stayed the case pending the completion of mediation, *see* Jan. 23, 2025 Minute Order. On February 19, 2025, the parties engaged in mediation before Magistrate Judge Harvey. *See* ECF No. 40, at 1. The parties continued negotiating after the mediation, and

in May 2025, they reached a "settlement-in-principle" of the case on a class-wide basis and indicated their intent to file a motion for preliminary approval of the settlement. *Id.* The parties finalized their settlement over the following year. *See* ECF Nos. 41, 43 to 48. In April 2026, Mr. Whetstone filed an unopposed motion for leave to file a second amended complaint, preliminary class certification, preliminary approval of the parties' proposed Settlement Agreement, and approval of the form and method of class notice. ECF Nos. 49, 50 (errata). The court accordingly lifted the stay in this matter. May 5, 2026 Minute Order.

## III. PROPOSED SETTLEMENT AGREEMENT

### A. Second Amended Complaint

The parties' proposed Settlement Agreement provides that Mr. Whetstone will file a second amended complaint adding Linda Hutchins as a named Plaintiff, defining the class period consistent with the terms of the settlement, and removing claims previously dismissed by the court. ECF No. 49-3, at 10; *see* ECF No. 49-1 (second amended complaint).

### B. Class Definition

The Settlement Agreement defines the relevant class as:

> All participants and beneficiaries of the Plan who are receiving monthly benefit payments as of the Measurement Date and (1) who have an Annuity Start Date that was on or after January 1, 1995 but before January 1, 2025 and (2) who are receiving a JSA that is less valuable than it would be if the participant's single life annuity were converted to a JSA using the interest rates and mortality tables set forth in 26 U.S.C. Section 417(e), determined under an annual stability period beginning each July 1 and a May lookback month.

ECF No. 49-3, at 5. The "Measurement Date" is the first day of the calendar month in which "Final Approval" of the settlement occurs—that is, when the court has entered judgment and that judgment is no longer subject to appeal. *Id.* at 6-7. The "Annuity Start Date" refers to the date

that a class member—or the associated Plan participant for class members who are beneficiaries—began receiving annuity benefit payments from the Plan. *Id.* at 4. Class counsel estimates that the class will include approximately 1,788 members. ECF No. 49-2 ¶ 4.

### C. Settlement Fund and Allocation

Defendants agree to pay $1.3 million as the Gross Settlement Amount. ECF No. 49-3, at 6-7. Defendants will amend the Plan to implement monthly pension benefit increases for class members. *See id.* at 16-20. The Settlement Agreement divides the class into two subgroups of members based on the date they began receiving annuity benefit payments from the Plan. *See id.* at 17-20. Subgroup A consists of class members whose Annuity Start Dates are on or after August 17, 2017. *Id.* at 17. Subgroup B consists of class members whose Annuity Start Dates precede August 17, 2017. *Id.* The Settlement Agreement allocates 75% of the Net Settlement Amount—the Gross Settlement Amount minus fees, costs, named Plaintiffs' Case Contribution Awards, and administrative expenses—to Subgroup A and 25% of the Net Settlement Amount to Subgroup B. *Id.*

*Subgroup A.* Each Subgroup A class member's monthly benefit increase will be calculated according to an individualized formula based on the participant's estimated alleged underpayment. *See id.* at 17-18. Class counsel's actuary will calculate the present value of each member's alleged underpayment by comparing (1) "the accumulated value of the benefits actually paid and expected to be paid under the Plan" with (2) "the value that would have been paid had the participant's [SLA] been converted using the settlement actuarial assumptions." ECF No. 49, at 8; *see* ECF No. 49-3, at 17-18. Each Subgroup A class member will receive a pro rata share of the Net Settlement Amount allocated to Subgroup A, based on each member's individual alleged underpayment. ECF No. 49-3, at 18. Monthly benefit increases will be determined by converting

that pro rata share using a monthly annuity factor based on the class member's benefit form. *Id.*; *see* ECF No. 49, at 9 ("Simply put, Subgroup A members receive a share of the settlement based on how much they were alleged[ly] underpaid in the past and anticipated to be underpaid in the future, and that amount is converted into a permanent increase in their monthly pension benefits.").

*Subgroup B.* Each Subgroup B class member's monthly benefit increase will be based on their current benefit levels. ECF No. 49-3, at 18-19; *see* ECF No. 49, at 9. Each class member will receive a share of the Net Settlement Amount allocated to Subgroup B based on the size of the class member's current monthly pension benefit relative to other Subgroup B class members. ECF No. 49-3, at 19. To determine each class member's monthly benefit increase, the member's share of the Net Settlement Amount will be converted using a monthly annuity factor that is based on the class member's benefit form. *Id.*

*Timing.* After final approval of the Settlement Agreement, Defendants will engage a third-party vendor to conduct a death audit of class census data. *Id.* Then, class counsel's actuary will prepare a proposed index reflecting each class member's monthly benefit increase, which will become final upon Defendants' counsel's review. *Id.* at 19-20. Monthly benefit increases will be implemented no later than 150 days after final approval. ECF No. 49, at 9; *see* ECF No. 49-3, at 4, 20.[2] Each class member will receive (1) "the increased monthly benefit amount payable on a going-forward basis," and (2) "a lump sum retroactive payment" reflecting the monthly benefit increases accrued from the Measurement Date to the date of implementation. ECF No. 49-3, at 20.

[2] To be precise, the Settlement Agreement provides that monthly benefits "shall be implemented no later than the Benefit Increase Payment Date," ECF No. 49-3, at 20, which is defined as "no later than the first day of the first calendar month that commences after one hundred and twenty (120) days following Final Approval," *id.* at 4.

*Attorney's fees and case contribution awards*. Class counsel intends to petition the court for a reasonable attorney's fee award not to exceed one-third of the Gross Settlement Amount—or $432,900—as well as for reimbursement of reasonable litigation expenses and costs. *Id.* at 14-15. Class counsel also intends to petition the court for approval of Case Contribution Awards of $5,000 each for named Plaintiffs Mr. Whetstone and Ms. Hutchins, which would be paid from the Gross Settlement Amount. *Id.* at 14. Any request for attorney's fees, costs, and service awards will be disclosed to the class before the final approval hearing. ECF No. 49, at 11; *see* ECF No. 49-3, at 15 ("The effectiveness of this Settlement Agreement is not contingent upon the Court awarding any specific amount of attorneys' fees, expenses, or costs. The Court's decision to award less than the amount requested shall not constitute grounds to modify, revoke, or terminate the Settlement.").

### D. Settlement Administrator

Class counsel intends to retain Angeion Group as the Settlement Administrator, subject to Defendants' approval. ECF No. 49-2 ¶ 63; ECF No. 49-3, at 9. The Settlement Administrator will, among other things, disseminate the notice form to all class members, establish a settlement website, handle inquiries from class members, inform class members of their benefits or awards as directed, and carry out other administrative duties. *Id.* at 9, 11-12.

### E. Release

In exchange for the aforementioned relief, class members will release the claims that were asserted in this action or that "arise out of, are based on, or relate to" the allegations in this action. ECF No. 49-3, at 20-21. The release does not extend to claims based on conduct unrelated to this

action and does not bar class members from raising claims regarding implementation of the Settlement Agreement or the calculation of monthly benefit increases. *Id.* at 21.

## IV. LEGAL STANDARDS

A district court's review of a proposed class action settlement agreement proceeds in three primary steps. *Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 189 (D.D.C. 2017). "First, the parties present a proposed settlement agreement to the court for so-called 'preliminary approval.'" *Id.* at 190 (quoting 4 William B. Rubenstein, *Newberg on Class Actions* § 13:10 (5th ed. 2014)). "Second, if the court does preliminarily approve the settlement (and conditionally certify the class), notice is sent to the class describing the terms of the proposed settlement and explaining class members' options with respect to the settlement agreement, including the right to object to the proposed settlement." *Id.* (internal quotation marks omitted) (quoting Rubenstein, *Newberg on Class Actions* § 13:10). Third, the court holds a hearing and may give final approval to the agreement only upon a "finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *see Ross*, 267 F. Supp. 3d at 190. The court may also certify the class during this last stage, if it has yet to do so. *See Ross*, 267 F. Supp. 3d at 190.

Whether to preliminarily approve a class action settlement agreement is within the district court's sound discretion. *Richardson v. L'Oreal USA, Inc.*, 951 F. Supp. 2d 104, 106 (D.D.C. 2013). The court must ensure that the "settlement is fair, adequate, and reasonable" and that it "is not the product of collusion between the parties." *Thomas v. Albright*, 139 F.3d 227, 231 (D.C. Cir. 1998) (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)). Where, like here, plaintiffs seek class certification and settlement approval simultaneously, the court must exercise "closer judicial scrutiny" than for settlements reached *after* a class is certified. *Trombley v. Nat'l City Bank*, 759 F. Supp. 2d 20, 23 (D.D.C. 2011) (quoting *Manual for Complex Litigation*, § 21.612

(4th ed. 2004)); *see Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ("Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold."). Generally, courts will "grant preliminary approval of a class action settlement if it appears to fall 'within the range of possible approval' and 'does not disclose grounds to doubt its fairness or other obvious deficiencies.'" *Richardson*, 951 F. Supp. 2d at 106 (quoting *Trombley*, 759 F. Supp. 2d at 23).

## V. DISCUSSION

### A. Second Amended Complaint

As a preliminary matter, Defendants consent to Mr. Whetstone's motion for leave to file a second amended complaint, which adds Ms. Hutchins as a named Plaintiff and expands the class period consistent with the Settlement Agreement. ECF No. 49, at 5; *see* ECF No. 49-1. The court accordingly grants Mr. Whetstone leave to file the second amended complaint. *See* Fed. R. Civ. P. 15(a) (permitting a party to amend his pleading "only with the opposing party's written consent or the court's leave").[3]

### B. Provisional Class Certification

To be certified as a class, Plaintiffs must meet the requirements of Rule 23(a) and fall into one of the Rule 23(b) categories. *Amchem Prods.*, 521 U.S. at 614. Here, Plaintiffs seek provisional certification of the following class:

> All participants and beneficiaries of the Plan who are receiving monthly benefit payments as of the Measurement Date and (1) who

[3] Mr. Whetstone's request to file a second amended complaint, ECF No. 49, at 5, supersedes his earlier request to file a second amended complaint, ECF No. 34; accordingly, the court will deny ECF No. 34 as moot.

> have an Annuity Start Date that was on or after January 1, 1995 but before January 1, 2025 and (2) who are receiving a JSA that is less valuable than it would be if the participant's single life annuity were converted to a JSA using the interest rates and mortality tables set forth in 26 U.S.C. Section 417(e), determined under an annual stability period beginning each July 1 and a May lookback month.

ECF No. 49-3, at 5; *see* ECF No. 49, at 7, 24. While Defendants do not contest class certification, the court must still ensure, "after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

**1. Rule 23(a)**

Rule 23(a) requires a showing that (1) "the class is so numerous that joinder of all members is impracticable"; (2) "there are questions of law or fact common to the class"; (3) "the claims or defenses of the [named plaintiffs] are typical of [those] of the class"; and (4) "the [named plaintiffs] will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). These requirements are referred to as numerosity, commonality, typicality, and adequacy. *Amchem Prods.*, 521 U.S. at 613. Here, Plaintiffs' proposed class satisfies the four requirements.

*a. Numerosity*

There are no "absolute limitations" on the numerosity requirement. *Harris v. Med. Transp. Mgmt., Inc.*, 77 F.4th 746, 759 (D.C. Cir. 2023) (quoting *Gen. Tel. Co. of the Nw. v. Equal Emp. Opportunity Comm'n*, 446 U.S. 318, 330 (1980)). The core inquiry focuses on the impracticability of joinder, but sheer numbers often serve as a proxy for that inquiry. *See Hinton v. District of Columbia*, 567 F. Supp. 3d 30, 52 (D.D.C. 2021). This court has presumed sufficient numerosity "when a proposed class has at least forty members." *Bunn ex rel. Coleman v. District of Columbia*, 306 F.R.D. 68, 76 (D.D.C. 2015) (quoting *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181,

196 (D.D.C. 2013)).[4] Plaintiffs "must provide some evidentiary basis beyond a bare allegation of the existence of numerous class members," but the court may "draw reasonable inferences from the facts presented to find the requisite numerosity." *Id.* (quoting *McCuin v. Sec'y of Health & Hum. Servs.*, 817 F.2d 161, 167 (1st Cir. 1987)).

Here, the two named Plaintiffs seek to represent approximately 1,788 putative class members who received JSAs or pre-retirement survivor annuities calculated under the Plan's challenged actuarial assumptions. ECF No. 49-2 ¶ 4; *see* ECF No. 49, at 25. Plaintiffs have provided a declaration by proposed class counsel, Oren Faircloth of the law firm Siri & Glimstad LLP, stating that the parties reviewed Plan data to reach this figure. ECF No. 49-2 ¶ 4. The proposed class therefore satisfies the numerosity requirement.

*b. Commonality*

In the simplest terms, commonality "requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal-Mart Stores*, 564 U.S. at 349-50 (internal quotation marks omitted) (quoting *Falcon*, 457 U.S. at 157). While the existence of "a uniform policy or practice" affecting all class members is generally sufficient to meet commonality, *Thorpe v. District of Columbia*, 303 F.R.D. 120, 145 (D.D.C. 2014) (quoting *D.L. v. District of Columbia*, 302 F.R.D. 1, 12 (D.D.C. 2013)), it is not necessary, *Harris*, 77 F.4th at 759. Rather, the putative class must rely on a "common contention of such a nature that it is capable of classwide resolution." *Harris*, 77 F.4th at 759 (internal quotation marks omitted) (quoting *Wal-Mart Stores*, 564 U.S. at 350). Put differently, what matters is not necessarily "the raising of common 'questions,'" but

---

[4] At the other end of the spectrum, "a class that encompasses fewer than [twenty] members will likely not be certified absent other indications of impracticability of joinder." *Bunn ex rel. Coleman*, 306 F.R.D. at 76 (quoting Rubenstein, *Newberg on Class Actions* § 3:11).

rather "the capacity of a class-wide proceeding to generate common *answers*" that will help resolve the litigation. *Wal-Mart Stores*, 564 U.S. at 350 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131-32 (2009)).

Here, all proposed class members are participants or beneficiaries of the same Plan and were subject to the same actuarial assumptions and conversion methodology that allegedly resulted in the systematic underpayment of pension benefits. ECF No. 49-3, at 5. The actuarial assumptions "were part of the Plan and applied uniformly across the entire Class," ECF No. 49-2 ¶ 52, so the core legal issue for all class members is whether Defendants' use of those assumptions resulted in benefits that were not actuarially equivalent in violation of ERISA. Accordingly, the putative class members' injuries arise out of a uniform policy, thereby satisfying the commonality requirement.

*c. Typicality*

While related to commonality, typicality asks whether the *named plaintiffs'* claims are sufficiently related to those of the entire class. *See Gen. Tel. Co. of the Nw.*, 446 U.S. at 330. This requirement is ordinarily satisfied "if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory." *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019) (per curiam) (quoting 7A Charles Alan Wright et al., *Federal Practice & Procedure* § 1764 (4th ed. 2019)). In this case, Mr. Whetstone and Ms. Hutchins are participants of the Plan who, like all class members, raise claims arising out of Defendants' alleged use of outdated actuarial assumptions. *See* ECF No. 49-1 ¶¶ 4, 24-25. Mr. Whetstone represents Subgroup A, whose members have Annuity Start Dates on or after August 17, 2017, *see id.* ¶ 24; ECF No. 49-3, at 17, and Ms. Hutchins represents Subgroup B, whose members have Annuity Start Dates prior to August 17, 2017, *see* ECF

No. 49-1 ¶ 25; ECF No. 49-3, at 17. While the Settlement Agreement uses different methodologies to calculate the subgroups' benefit increases, *see* ECF No. 49-3, at 17-20, Mr. Whetstone's and Ms. Hutchins's claims arise from the same allegedly unlawful Plan methodology, and their claims are typical of their respective subgroup.

*d. Adequacy*

Finally, whether Mr. Whetstone and Ms. Hutchins will adequately represent the interests of the class depends on two criteria: (1) "the named representative[s] must not have antagonistic or conflicting interests with the unnamed members of the class"; and (2) "the representative[s] must appear able to vigorously prosecute the interests of the class through qualified counsel." *Nat'l Ass'n of Reg'l Med. Programs, Inc. v. Mathews*, 551 F.2d 340, 345 (D.C. Cir. 1976). Rule 23(g)(1)(A) requires the court to consider: (i) "the work counsel has done in identifying or investigating potential claims in the action"; (ii) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (iii) "counsel's knowledge of the applicable law"; and (iv) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

Here, the named Plaintiffs share the same interests and goals as the putative class: they seek to remedy Defendants' alleged ERISA violations and obtain ERISA-compliant benefit payments from the Plan. Mr. Whetstone and Ms. Hutchins have actively participated in this litigation by conferring with counsel, reviewing pleadings, and taking part in settlement discussions. ECF No. 49-2 ¶ 54. Mr. Whetstone and Ms. Hutchins also belong to different class subgroups, which ensures that the interests of all class members are represented, and there is no indication that either Plaintiff has antagonistic or conflicting interests with unnamed class members or with members of the opposite subgroup. *See id.* ¶¶ 54-55.

Mr. Whetstone and Ms. Hutchins have retained Siri & Glimstad LLP, a law firm with extensive experience in complex ERISA class action litigation. *See id.* ¶¶ 1, 42, 58-59, 62; ECF No. 49-6. Class counsel has devoted substantial time and resources to this case over the past three years, litigating novel legal issues, engaging experts, and participating in settlement negotiations before Magistrate Judge Harvey. ECF No. 49-2 ¶¶ 60-61. The court is thus confident that both the named Plaintiffs and counsel adequately represent the interests of the class.

**2. Rule 23(b)**

In addition to meeting Rule 23(a)'s four requirements, class action plaintiffs must also demonstrate that they fall into one of Rule 23(b)'s three categories. Fed. R. Civ. P. 23(b)(1)-(3). Here, as in most ERISA class actions, Plaintiffs seek certification under Rule 23(b)(1). ECF No. 49, at 29-30; *see Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 111 (N.D. Cal. 2008) ("Most ERISA class action cases are certified under Rule 23(b)(1)."). Rule 23(b)(1) permits a class action to proceed when:

> prosecuting separate actions by . . . individual class members would create a risk of:
>
> > (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
> >
> > (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests[.]

Fed. R. Civ. P. 23(b)(1). Subsection A "seeks to prevent prejudice to the party opposing the class," while Subsection B "seeks to prevent prejudice to other class members who did not participate in

the litigation." *Harris v. Koenig*, 271 F.R.D. 383, 392 (D.D.C. 2010). The court concludes that Plaintiffs satisfy either prong of Rule 23(b)(1).

First, under Rule 23(b)(1)(A), if more than 1,700 putative class members were to file individual lawsuits, there would be a risk of inconsistent adjudications with respect to both Defendants' compliance with ERISA and the appropriate method for calculating damages. *See* ECF No. 49, at 29. Inconsistent decisions regarding the Plan-wide methodology for calculating benefits would impose "incompatible standards of conduct" on Defendants. Fed. R. Civ. P. 23(b)(1)(A). Moreover, "certification under Rule 23(b)(1)(A) is appropriate . . . where Plaintiffs claim that fiduciary duties owed to all class members equally were breached." *Abraha v. Colonial Parking, Inc.*, No. 16-CV-680, 2020 WL 4432250, at *6 (D.D.C. July 31, 2020); *see* ECF No. 49-1 ¶¶ 107-119 (alleging breach of fiduciary duty).

Certification under Rule 23(b)(1)(B) is also appropriate because individual actions by putative class members "would have the practical if not technical effect of concluding the interests of the other members as well, or of impairing the ability of the others to protect their own interests." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 833 (1999) (internal quotation marks omitted). Plaintiffs' claims concern Defendants' administration of the Plan and Plaintiffs seek Plan-wide relief, so "adjudication of issues related to ERISA requirements 'would necessarily affect and be dispositive of the interests of other similarly situated litigants." *Ramirez v. AMPAM Parks Mech., Inc.*, No. 24-CV-1038, 2025 WL 1090186, at *7 (C.D. Cal. Mar. 18, 2025) (quoting *Tom v. Com Dev USA, LLC*, No. 16-CV-1363, 2017 WL 8236268, at *5 (C.D. Cal. Sep. 18, 2017); *see Nesbeth v. ICON Clinical Rsch. LLC*, No. 21-CV-1444, 2022 WL 22893879, at *3 (E.D. Pa. Mar. 10, 2022) ("[G]iven the nature of an ERISA claim which authorizes plan-wide relief, there is a risk that

failure to certify the class would leave future plaintiffs without relief." (quoting *In re Ikon Off. Sols., Inc.*, 191 F.R.D. 457, 466 (E.D. Pa. 2000))).

* * *

For these reasons, the court concludes that Plaintiffs meet the requirements of both Rule 23(a) and Rule 23(b)(1). The court thus provisionally certifies the putative class.

### C. Preliminary Settlement Approval

"[T]here is a long-standing judicial attitude favoring class action settlements." *Cohen v. Chilcott*, 522 F. Supp. 2d 105, 114 (D.D.C. 2007). Approval of a proposed class-action settlement is governed by Rule 23(e), which requires a finding that the agreement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The "D.C. Circuit has not announced a specific test" for preliminary approval, but courts in this jurisdiction usually consider five factors: (1) "whether the settlement is the result of arm's-length negotiations"; (2) "the terms of the settlement in relation to the strengths of [the] plaintiffs' case"; (3) "the status of the litigation proceedings at the time of settlement"; (4) "the reaction of the class"; and (5) "the opinion of experienced counsel." *Stephens v. Farmers Rest. Grp.*, 329 F.R.D. 476, 486 (D.D.C. 2019) (alteration in original) (quoting *Alvarez*, 303 F.R.D. at 163).

#### 1. Arm's length negotiations

There is a "presumption of fairness, adequacy, and reasonableness" for class-action settlements reached through "arm's length negotiations between experienced, capable counsel after meaningful discovery." *In re Vitamins*, 305 F. Supp. 2d at 104 (quoting *Manual for Complex Litigation (Third)* § 30.42 (1995)). Here, the court has no reason to doubt that the parties' dispute over the merits of Plaintiffs' claims is genuine. Defendants previously moved to dismiss the case,

ECF No. 19, and, after the court denied their motion to dismiss Counts I and III, the parties began discovery, *see* ECF No. 31; *see also Abraha*, 2020 WL 4432250, at *7 ("The history of this action further demonstrates the genuineness of the dispute."). The parties thereafter participated in a full-day remote mediation session before Magistrate Judge Harvey, during which the parties "significantly narrowed the issues between [them]." ECF No. 49-2 ¶ 18. After the mediation, the parties continued negotiating and exchanged participant data, expert analyses, and other information. *Id.* ¶ 19. And once the parties reached an "agreement in principle," they spent several additional months refining the details of the proposed Settlement Agreement. *Id.* ¶ 20; *see* ECF Nos. 40, 41, 43 to 48. Throughout the case, both sides have been represented by counsel experienced in litigating complex ERISA class actions. *See* ECF No. 49-2 ¶ 42. Class counsel has also submitted a declaration under penalty of perjury attesting that the settlement was "reached in the absence of collusion and is the product of good faith, informed, and arm's-length negotiations by competent and experienced counsel, facilitated by Magistrate Judge Harvey." *Id.* ¶ 47. The court thus concludes that the proposed settlement was the result of arm's length negotiations.

**2. Terms of the settlement in relation to the strength of Plaintiffs' case**

"Assessing the terms of the settlement in relation to the strength of the plaintiffs' case requires 'compar[ing] the terms of the settlement with the likely recovery plaintiffs would attain if the case proceeded to trial, an exercise which necessarily involves evaluating the strengths and weaknesses of plaintiffs' case.'" *Howard v. Liquidity Servs. Inc.*, No. 14-CV-1183, 2018 WL 4853898, at *5 (D.D.C. Oct. 5, 2018) (quoting *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative & "ERISA" Litig.*, 4 F. Supp. 3d 94, 103 (D.D.C. 2013)). This factor may be "the most important

factor a court considers when evaluating a proposed settlement." *Trombley*, 826 F. Supp. 2d at 195.

Plaintiffs assert that the proposed settlement provides class members with "meaningful and immediate relief that is more than adequate when weighed against the risks, costs, and delays of continued litigation." ECF No. 49, at 16. Class counsel represents that Defendants would have "vigorously opposed [class] certification" and mounted a "competent defense at trial." ECF No. 49-2 ¶¶ 35, 44. Plaintiffs also emphasize that while they believe in the strength of their claims, their lawsuit arises in a complex and unsettled area of law, and proceeding to a full trial would require the parties to incur significant costs and potentially result in an appeal. *See* ECF No. 49, at 16-18; *see also Cohen*, 522 F. Supp. 2d at 118 ("Even if Plaintiffs had prevailed over these obstacles at trial, it is likely that any verdict would have been followed by an appeal, which might have further delayed the final resolution of this case."). The court agrees.

Notably, the legal landscape for actuarial equivalence claims under ERISA is largely unsettled. *See* ECF No. 49, at 17 (citing divergent rulings in other circuits regarding similar actuarial equivalence claims); *see also* ECF No. 49-2 ¶ 34 (similar). For example, a divided panel of the U.S. Court of Appeals for the Sixth Circuit recently held that—consistent with Plaintiffs' view—ERISA Section 205(d) "prohibits employers from using unreasonable, inappropriate actuarial assumptions when calculating [qualified JSAs]." *Reichert v. Kellogg Co.*, 170 F.4th 473, 487 (6th Cir. 2026). At the same time, "[d]istrict courts across the country are split on [the] issue" whether actuarial equivalence has a reasonableness requirement under ERISA. *Berkeley v. Intel Corp.*, No. 23-CV-343, 2026 WL 948725, at *4 (N.D. Cal. Apr. 8, 2026) (collecting cases and distinguishing *Reichert*). Additionally, proceeding to trial in this case would likely require a "costly 'battle of the experts' because the key question in this case—whether Class Members' JSA

benefits were less than the actuarial equivalent of the SLAs that they could have selected—is one that is highly technical and not within a lay person's expertise." ECF No. 49, at 17; *see Howard*, 2018 WL 4853898, at *5 (finding a settlement reasonable where it allowed the plaintiffs to avoid "a battle of the experts" and "many other trial risks" (internal quotation marks omitted)). And even if Plaintiffs were to prevail on the issue of Defendants' liability, Plaintiffs assert that "proving damages [would also be] difficult and uncertain." ECF No. 49, at 18. Specifically, the risks associated with Subgroup B's claims are "particularly pronounced" because Defendants have strong statute of limitations defenses and the evidentiary record for those class members would be "materially more limited." ECF No. 49-2 ¶ 37. The proposed settlement would thus allow Plaintiffs to avoid these legal and factual uncertainties and obtain immediate recovery in the form of an "increase in their monthly pension checks." *Id.*

Weighing these considerations, the court concludes that the parties' proposed $1.3 million settlement—which includes attorney's fees and other expenses—is reasonable in relation to the strength of Plaintiffs' claims. Class counsel represents that in their "experienced judgment, the Settlement represents an excellent result for the Settlement Class, providing substantial monetary and structural relief without the delay, expense, and uncertainty that continued litigation would entail." ECF No. 49-2 ¶ 40. The parties settled on a "two-tiered allocation methodology" based on the different characteristics of the subgroups, such as the availability of participant data and "the risks associated with providing damages for earlier time periods." *Id.* ¶ 23. Class counsel explains that the allocation plan "is designed to reach an equitable and rational distribution of settlement proceeds[] while also representing the most practical and administratively efficient method for allocating relief." *Id.* ¶ 26. And, importantly, "Defendants' counsel agreed that, given the data limitations and risks, [the settlement] represents a fair and reasonable method for

distributing relief." *Id.* Plaintiffs' actuarial expert estimates that the Settlement Agreement represents a recovery of around 30.8% for Subgroup A class members and 18.2% for Subgroup B class members, "with the higher recovery for Subgroup A reflecting the relative strength of those claims and the greater precision with which individual alleged losses can be quantified." *Id.* ¶ 27. These rates are consistent with what plaintiffs in similar ERISA actuarial equivalence class actions have recovered. *See* ECF No. 49, at 19-20 (collecting cases). In *Franklin v. Duke University* No. 23-CV-833, 2026 WL 191142 (M.D.N.C. Jan. 26, 2026), for example, the court concluded that 17% recovery in an ERISA actuarial equivalence case supported settlement approval. *Id.* at *6. While "[t]hat percentage of recovery [was] marginally lower than similar ERISA cases," the court noted that the plaintiff faced "unusually strong headwinds if litigation [were to] continue[,] . . . given the complex and expert-dependent nature of ERISA cases in general and actuarial equivalence cases in particular." *Id.* Here, the class members face similarly "strong headwinds" and stand to recover more than 17%.

Finally, the Settlement Agreement requires an "Independent Fiduciary"—whose selection must be approved by both parties—to review and approve the final settlement. *See* ECF No. 49-3, at 7, 12-13. The Independent Fiduciary's role will further aid the court in determining whether the final terms of the Settlement Agreement are fair. The court accordingly finds that the terms of the settlement are reasonable for purposes of preliminary approval, although the court "will continue to give close scrutiny to the proposed settlement amount in the final fairness assessment." *Trombley*, 759 F. Supp. 2d at 26.[5]

[5] The court will address the reasonableness of the named Plaintiffs' Case Contribution Awards and class counsel's requested attorney's fees after the final approval hearing. *See, e.g.*, *Radosti v. Envision EMI, LLC*, 760 F. Supp. 2d 73, 76-80 (D.D.C. 2011).

### 3. Litigation status at the time of settlement

Under the third factor, courts ask "whether counsel had sufficient information, through adequate discovery, to reasonably assess the risks of litigation vis-à-vis the probability of success and range of recovery." *Kinard*, 331 F.R.D. at 216 (quoting *Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 565 F. Supp. 2d 49, 57 (D.D.C. 2008)). Class counsel represents that he engaged in significant factual and legal investigation of Plaintiffs' claims and Defendants' potential defenses. ECF No. 49-2 ¶ 41; *see id.* ¶¶ 9-16. Both sides also retained actuarial experts and exchanged participant data and expert analyses before finalizing the proposed Settlement Agreement. *See id.* ¶¶ 13, 19, 26. The court is thus satisfied that the parties had sufficient evidence to conclude that a settlement was in their best interests.

### 4. Reaction of the class

Because notice has not yet been sent to the class, the court will evaluate class members' reactions later in the proceedings, but before final approval. The named Plaintiffs approve of the Settlement Agreement. ECF No. 49-2 ¶¶ 48-49. *See De Martinez v. Tier-One Prop. Servs., LLC*, No. 23-CV-2339, 2025 WL 506610, at *10 (D.D.C. Feb. 14, 2025) (taking a similar approach).

### 5. Opinion of experienced counsel

"The opinion of experienced counsel 'should be afforded substantial consideration by a court in evaluating the reasonableness of a proposed settlement.'" *Stephens*, 329 F.R.D. at 488-89 (quoting *Cohen*, 522 F. Supp. 2d at 121). Class counsel and Defendants' counsel have extensive experience litigating complex ERISA class actions, including cases involving actuarial equivalence claims. ECF No. 49-2 ¶ 42; *see id.* ¶¶ 58-62; ECF No. 49-6. "Counsel on both sides . . . agree that the Settlement represents an appropriate resolution of a vigorously contested

dispute," ECF No. 49-2 ¶ 48, and class counsel states that in his "professional opinion, the relief provided by the proposed Settlement is fair, adequate, reasonable, and in the best interests of the Settlement Class," *id.* ¶ 49.

* * *

For these reasons, the court preliminarily approves the Settlement Agreement.

### D. Notice and Further Proceedings

Under Rule 23(e)(1)(B), the court "must direct notice . . . to all class members who would be bound by the proposal" in a way that is "reasonably calculated . . . to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Stephens*, 329 F.R.D. at 490 (second alteration in original) (first quoting Fed. R. Civ. P. 23(e)(1)(B); then quoting *Brown v. Wells Fargo Bank, N.A.*, 869 F. Supp. 2d 51, 64 (D.D.C. 2012)).

The proposed Notice combines the required information under Rule 23(e) with the notice requirements of Rule 23(c).[6] *See* ECF No. 50-1 (corrected proposed notice). It provides the class members with all the relevant information related to this proceeding: it explains the background and context of the lawsuit, *id.* at 1-2; the definition of the class, *id.* at 2; the terms and total amount of the settlement, *id.*; the steps necessary to object, *id.* at 3; and, once scheduled, the time of the final fairness hearing to approve the Settlement Agreement, *id.* at 3-4. The court concludes that the proposed Notice satisfies Rule 23(c) and (e).

---

[6] Rule 23(c) concerns notice procedures for certified classes apart from those for settlement agreements. Fed. R. Civ. P. 23(c)(2).

## VI. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that Mr. Whetstone's Unopposed Motion for Preliminary Approval of Class Action Settlement, ECF No. 49, is **GRANTED**;

**ORDERED** that the Clerk of Court shall docket the Second Amended Complaint, ECF No. 49-1, as Plaintiffs' operative complaint, and Mr. Whetstone's Motion for Leave to File Second Amended Class Action Complaint, ECF No. 34, is **DENIED** as moot;

**ORDERED** that the class defined in the Settlement Agreement, ECF No. 49-3, at 5, is provisionally certified for settlement purposes;

**ORDERED** that the terms of the Settlement Agreement, including all of its provisions, definitions, and procedures, are hereby preliminarily approved, subject to further consideration at the final fairness hearing;

**ORDERED** that the named Plaintiffs, Stephen G. Whetstone and Linda Hutchins, are approved as the class representatives for the settlement class;

**ORDERED** that Oren Faircloth of Siri & Glimstad LLP is approved as class counsel;

**ORDERED** that the proposed Notice, ECF No. 50-1, attached as Exhibit A below, and the proposed manner of disseminating said Notice, are approved. Once the Notice has been disseminated to class members, such distribution shall constitute sufficient notice of the proposed Settlement Agreement and fairness hearing under Federal Rule of Civil Procedure 23;

**ORDERED** that, within forty-five days of the entry of this Memorandum Opinion and Order, the Settlement Administrator shall disseminate final versions of the Settlement Notice to the class. For any class members whose Settlement Notices are returned as undeliverable, the

Settlement Administrator shall use commercially reasonable efforts to locate a current address and re-send the Settlement Notice;

**ORDERED** that any class member who wishes to object to the Settlement Agreement may file their written objection with this court at least thirty days before the final fairness hearing;

**ORDERED** that the parties shall meet, confer, and contact Courtroom Deputy Clerk Margaret Pham (Margaret_Pham@dcd.uscourts.gov) on or before October 2, 2026, proposing three mutually agreeable dates and times on or after December 18, 2026 for a final fairness hearing;

**ORDERED** that Plaintiffs shall file motions for final approval of the Settlement Agreement and for fees, awards, and other expenses at least fourteen days before the final fairness hearing; and

**ORDERED** that this Memorandum Opinion and Order may be modified by the court upon motion by either party, for good cause.

**SO ORDERED.**

LOREN L. ALIKHAN
United States District Judge

Date: September 18, 2026